[No. 3,815.]

# H. C. KIRK v. A. J. RHOADS.

ELECTION LAW IN SACRAMENTO.—The general election laws of this State, with their successive modifications and changes, apply, so far as practicable, and so far as they are not inconsistent with the Act incorporating Sacramento, to the municipal elections in said city.

JURISDICTION OF COUNTY COURT OF SACRAMENTO COUNTY.—The County Court of the County of Sacramento has jurisdiction to hear and determine a contest concerning the right to hold a municipal office in the City of Sacramento.

ADOPTION OF OTHER STATUTES INTO AN ACT.—The Legislature may, in an election law for a city, adopt and make a part of the same the general law of the State regulating elections, not only as it exists at the time, but as it may exist after changes or modifications of the same.

GENERAL ELECTION LAWS OF THIS STATE. — Section one thousand one hundred and eleven and the following section of the Code of Civil Procedure, providing for the contest of elections, are a part of the general system for the regulation of elections in this State.

AFFIDAVIT TO GROUNDS OF CONTEST OF ELECTION.—The affidavit to the written statement of the grounds of the contest of an election may be in the form of an ordinary verification to a pleading.

REJECTING BALLOTS CAST BY AN ELECTOR.—A ballot cast by an elector
at an election should not be rejected simply because it differs from the regu-
lations prescribed in the Code, in matters over which the elector has no
control, such as the size of the ballot, the kind of paper on which it is
printed, or the character of type, or leading used in printing.

APPEAL from the County Court, Sacramento County.

Judgment was rendered for the contestant Kirk, and the
defendant appealed.

The other facts are stated in the opinion.

*Creed Haymond,* for Appellant.

The Court had no jurisdiction of the subject matter of
the proceeding. (Code of Civil Procedure, Sec. 1111.) The
Court had no authority to call a special term. (Code of Civil
Procedure, Secs. 1115, 446.) The Court erred in refusing
to dismiss, and in overruling appellant's objection to hearing
the cause. (Code of Civil Procedure, Secs. 1115, 446.) The
Court erred in admitting in evidence the ballots, and in re-
fusing to strike out the same on motion of appellant. (Polit-
ical Code, Secs. 1259, 1260, 1261, 1264, 1265, 1266.)

*John C. Burch* and *Matt. F. Johnson,* for Respondent.

The Court had jurisdiction to try the contest, under the
provisions of Title II, Part III, Code of Civil Procedure.
Secs. 1111 to 1127, inclusive, are identical with the statutes
of 1850, p. 106, which were in force when the Codes were
adopted. The title of the Act of 1850 is "An Act to regu-
late elections," and the provisions of Title II, Part III, of
the Code of Civil Procedure, as Article VI of said Act of
1850, p. 106, had, as a caption in its original publication, the
following : "Of contesting elections other than for members
of the Legislature, Governor, and Lieutenant Governor,"
evidently intending thereby to provide for all election con-
tests other than such as were not by the Act specially pro-
vided for elsewhere in its provisions. Such, too, was the

evident intention of the Code of Civil Procedure. It will be observed, by examining the election law of the Political Code, that the old remedy by a recount of the ballots is superseded, and the intention expressed of giving the Courts the power to try all contested elections, and preserving the ballots as evidence for that purpose. (See Sec. 1266, Political Code, annotated ed., and note.)

It is true that the language gives only express power as to county, township, and district officers, but the proceeding previously existing by way of recount being superseded, and no other pointed out or provided, this Court necessarily has jurisdiction; otherwise there is a wrong without a remedy. This Act originally intended to provide for all contests other than those excepted therein; and, taken in connection with the other Codes, this was to supply the place of the recount formerly existing. Besides, the City of Sacramento is a political subdivision of the State, and is a district within the meaning of Title II, Part III, Code Civil Procedure, Sec. 1115, Subd. 1. (See *Saunders* v. *Haynes*, 13 Cal. 145, for construction of this Act; for the rule of the Code for continuing statutes, see Sec. 5, Political Code; and for construction of statutes, see Sec. 4, id.)

The provisions of Title II, Part III, of the Code of Civil Procedure, comprised a portion of the election law existing at the date of the passage of the Act chartering Sacramento City (April 25th, 1863), and these provisions were virtually incorporated into that Act by section thirty-one thereof, and so is also all other provisions of the existing election law of the State ; and it makes no kind of difference into how many parts the law so incorporated may, by subsequent legislation, be divided, nor into how many different books it may have some of its provisions placed. If they exist, they are in the Codes but a continuation of the preëxisting statute. (See Political Code, Sec. 5.) On this point, however, the decision of the Court below is fully sustained by the case

there cited.   (*Spring Valley Waterworks* v. *San Francisco*, 22 Cal. 384.

The Court below properly refused to throw out the twenty-two votes claimed to be cast in disregard of section eleven hundred and ninety-one of the Political Code.   (Cooley's Const. Lim. pp. 74, 75, 618; *Torry* v. *Milbury*, 21 Pick. 67; *Rex* v. *Rocksdate*, 1 Burr, 447; *People* v. *Cook*, 14 Barb. 290; *People* v. *Higgins*, 3 Mich. 283.)

By the Court, NILES, J.:

At a municipal election in the City of Sacramento, the appellant Rhoads was declared by the canvassing officers to have been duly elected a member of the Board of Fire Commissioners.   Kirk, who received the next highest number of votes for the same office, instituted proceedings in the County Court to contest the right of this appellant to the office, charging malconduct upon the part of the Board of Judges of Election in counting votes for Rhoads which should not have been so counted, and in omitting to count other votes for the contestant which should have been counted for him.

Rhoads moved to dismiss the proceedings upon the ground that the County Court had no jurisdiction in such cases.

The provisions of Title II, Part III, of the Code of Civil Procedure, which treats of the contest of elections, are the same in all material respects as those of Article VI of the Act of March 23d, 1850, entitled an "Act to regulate elections."   By section eleven hundred and eleven of the Code (corresponding with section fifty-one of the Act of 1850), it is provided that "any elector of the county may contest the right of any person declared elected to an office to be exercised in and for such county; and, also, any elector of a township may contest the right of any person declared

elected to any office in and for such township, for any of the following causes," etc.

It is contended by the appellant that since these provisions do not include city officers, the legality of an election to such office cannot be investigated by the County Court under the Act. On the other hand it is claimed by the contestant that however the contest of municipal elections in other cities may be affected by the terms of either statute, the elections in the City of Sacramento are within the purview of one or the other, by virtue of the thirty-first section of the "Act to incorporate the City of Sacramento," passed April 25th, 1863, which provides that "all the provisions of law in force regulating elections, so far as the same are applicable and not inconsistent with the provisions of this Act, shall apply to the election of city officers by the voters of this city." (Stats. 1863, p. 428.)

As we construe this section, it was intended to apply to each municipal election of the City of Sacramento, so far as practicable, the provisions of the general election laws of the State, as existing at the time the election is held, and not merely those existing at the time the incorporating Act was passed. This is not inconsistent with the doctrine of *Spring Valley Waterworks* v. *San Francisco,* 22 Cal. 438.

The Act of 1858, "for the incorporation of water companies," provided that the mode of proceeding by such companies to appropriate lands "shall be the same as prescribed" in certain sections of the Act of eighteen hundred and fifty-three for incorporating railroad companies. It was held that this was a substantial incorporation of those sections into the Act of eighteen hundred and fifty-eight, and that notwithstanding any change or repeal of the railroad Act, they remained in force so far as the law relating to water companies was concerned. But there is an obvious distinction between the adoption into one Act of a provision as prescribed in another specified Act, and the adoption in a

special Act of a general system *in force* by virtue of general laws. We think it is in accordance with the evident intent of the Legislature, to hold that the general election law of the State should apply, so far as applicable, and with its successive modifications and changes, to the municipal elections of Sacramento. Section one thousand one hundred and eleven and the following sections of the Code of Civil Procedure providing for the contest of elections, are a part of the general system for the regulation of elections, although separated from other cognate provisions by the arrangement of the Code. It follows from these views that the County Court had jurisdiction of the proceedings.

2. It was objected at the trial, that the order for the special term to hear and determine the contest was void, "because no statement verified by the affidavit of the contesting party that the matters and things therein contained are true, had been filed with the County Clerk at or prior to the making of said order." Section one thousand one hundred and fifteen of the Code of Civil Procedure provides that the written statement of the grounds of contest "must be verified by the affidavit of the contesting party that the matters and things therein contained are true." The affidavit in this case was in the ordinary form of a verification of a pleading, and averred that the statement was true, except as to matters therein set forth on information and belief, and as to those matters affiant believed it to be true. This was a substantial compliance with the statute. To hold that the contestant must make oath to the absolute verity of every averment of the statement, would prevent the contest of an election in almost any conceivable case, and would work a practical abrogation of a beneficial law. From the very nature of the case, many and frequently most of the essential facts must come to the knowledge of the contestant through the statements of others; for he cannot be present at the various polling places to observe the conduct of the

officers of election. We think the object of the provision was merely to require a verification of the statement, but not to prescribe its form or terms. The object of the law is gained when the affidavit is in the ordinary form of a verification of a pleading.

3. Upon the main point presented by the record, we cannot express our own opinion better than by adopting the language of the learned Judge of the Court below, both in his statement of facts and conclusions of law :

" During the progress of counting the ballots in this Court, objections were made to counting a number of ballots, because they did not comply with the requirements of the Code. Section eleven hundred and ninety-one of the Political Code provides, that no ticket shall be used at any election, or circulated on the day of election, unless:

"First—It is written or printed on paper furnished by the Secretary of State, or upon paper in every respect like such paper.

"Second—It is four inches in width and twelve inches in length, or within one eighth of an inch of such size.

"Third—If printed, the names of the persons voted for, and the office designated, are printed in black ink and in long primer capitals—the name of the office in small capitals, and of the person in large capitals, and both without spaces, except between the different words or initials in each line.

"Fourth—If printed, the same margin is left above the printed matter as below it, and the side margins are equal in size.

"Fifth—If printed, the lines are straight, and the matter single leaded.

"Sixth—If written, the matter is so written that no sign thereof appears when the paper is folded; and,

"Seventh—It is free from every mark, character, or device

or thing that would enable any person to distinguish it by the back, or, when folded, from any other legal ticket or ballot.

"Section twelve hundred and seven is as follows : 'When a ballot found in any ballot box bears upon it any impression, device, color, or thing, or is folded in a manner intended to designate or impart knowledge of the person who voted such ballot, it must, with all its contents, be rejected.'

"Section twelve hundred and eight reads as follows : 'When a ballot found in any ballot box does not conform to the requirements of section eleven hundred and ninety-one, it must, with all its contents, be rejected.'

"The object of these provisions is to secure the freedom and purity of elections, and to place the elector above and beyond the reach of improper influences or restraint in casting his ballot. When all the ballots cast are similar in appearance, and without any distinguishing mark or charateristic, the most dependent elector in the county may vote with perfect freedom, as his employer or other person upon whom he is dependent has no means of ascertaining for whom he voted.

"It will be observed that there are two classes of things required by section eleven hundred and ninety-one. Over one class the elector can have no control, over the other he has perfect control.

"For instance, whether the paper on which his ballot was printed was furnished by the Secretary of State or not, or upon paper in every respect *precisely* like such paper, or whether it is four inches in width and twelve inches in length, or falls short of this measurement by an eighth, or a sixth, or a fourth of an inch, or whether it is printed in long primer capitals or not, or whether it is single or double leaded; these are matters over which the great majority of electors have no control, and about some of which they are

entirely ignorant. The ballots are always furnished on the day of election by committees appointed for the purpose by the respective political parties, or by independent candidates or their friends. The elector, in but few instances, ever sees these tickets until he approaches the polls to cast his ballot, and it would be absurd in the extreme to require him to have a rule by which he could measure and ascertain whether his ticket exceeded or fell short of twelve inches in length by a sixth of an inch, or only by an eighth of an inch, or whether the color of his ticket was of the exact shade of the paper furnished by the Secretary of State.

"Again, not one elector in five hundred knows the difference between long primer capitals or any other capitals, or whether his ticket is single or double leaded. It is impossible that he should know, or be able to determine these facts. This very case presents a striking instance of the absurdity of requiring the elector to judge of these facts.

The respondent, Rhoads, by his counsel, objected to counting twenty-two ballots for Kirk, upon the grounds that they were not printed in long primer capitals, and that the lines were double leaded.

"A foreman in a printing office was called in as an expert, and examined under oath as to whether the tickets objected to were printed in long primer capitals, and as to whether they were single or double leaded. He compared these tickets with the others to which no objection had been made, and he testified that all the tickets were printed with the same character of type, *i. e.*, type known by the same name, but with a different face upon it. After measuring the tickets carefully, witness testified that the printing on the tickets to which objection was made, occupied a space about one eighth of an inch longer on the paper than was occupied by the printing on the other ballots. He also testified that these twenty-two tickets were either double leaded, or that a heavier lead than that known

as a single lead had been used. He further testified that all the ballots examined by him were double leaded in places; none of them, in fact, strictly complying with the requirements of the Code.

"From this testimony it is perfectly clear that none but an expert, with his dividers in his hand, could possibly tell whether a given ticket complied with the requirements of the law or not; and to reject such tickets, cast in good faith by a qualified elector, would be to destroy instead of to protect the freedom and purity of elections. The difference in space occupied by two lines—the one double leaded, and the other single leaded—is only the one sixty-fourth part of an inch—a difference too minute to be determined except by measurement with the dividers.

"To defeat the will of the people in any election it would only be necessary to furnish the electors or a portion of them with tickets in which the printed lines were one sixty-fourth part of an inch further apart than required by the Code—a difference which cannot be detected except by an expert.

"There are, however, other requirements of the Code within the power of the elector to control, and these, if willfully disregarded, should cause his ballot to be rejected. He can see, for instance, that his ballot is 'free from every mark, character, device, or thing that would enable any one to distinguish it by the back,' and if, in willful disregard of law he places a name, number, or other mark on it, he cannot complain if his ballot is rejected and he loses his vote."

We agree with the County Judge in his conclusion that the twenty-two ballots spoken of were properly counted for Kirk, and that the motion to strike them from the count was properly denied.

Judgment affirmed.