[S.F. No. 22916. In Bank. Mar. 30, 1973.]

ABRAN RAMIREZ et al., Petitioners, v.
EDMUND G. BROWN, JR., as Secretary of State, etc., et al., Respondents.

## COUNSEL

Burton D. Fretz, Charlotte M. Fischman, Martin P. Glick, Philip J. Jimenez, David Kirkpatrick, Gene Livingston and Donald G. Green for Petitioners.

Philip L. Goar and Fred Okrand as Amici Curiae on behalf of Petitioners.

Evelle J. Younger, Attorney General, Iver E. Skjeie, Assistant Attorney General, Charles P. Just and George J. Roth, Deputy Attorneys General, William H. Stoffers, County Counsel (Monterey), Duncan M. James, District Attorney (Mendocino), and William De Garmo for Respondents.

## OPINION

**MOSK, J.**—This is a proceeding for writ of mandate brought by three ex-felons to compel respondent election officials to register them as voters. The case calls into question once again the constitutionality of provisions of California law excluding from the franchise all persons who have been

convicted of an "infamous crime." We addressed ourselves to this problem seven years ago in *Otsuka* v. *Hite* (1966) 64 Cal.2d 596 [51 Cal. Rptr. 284, 414 P.2d 412]. Petitioners now ask us to consider the matter further in the light of significant intervening developments in the law of equal protection. As will appear, we conclude that under present standards disfranchisement by reason of conviction of crime is no longer constitutionally permissible.

Petitioner Ramirez is a 43-year-old farmworker, married, with five children. Twenty-one years ago he was convicted in Texas of a felony entitled "robbery by assault." He avers that the offense arose out of an argument in a restaurant, and that at the trial he was without counsel and pleaded guilty on the advice of the judge. After serving only three months in jail he was released on parole. His parole successfully terminated 11 years ago.

In February 1972 petitioner applied to register to vote in San Luis Obispo County. He was refused registration by respondent San Luis Obispo County Clerk on the sole ground that he had been convicted of a felony and had spent some time in incarceration.

Petitioner Lee, a resident of Salinas, is 54 years old, married, with four children. Eighteen years ago he was convicted of the felony of possession of heroin. After serving two years in prison he was released on parole. His parole successfully terminated 14 years ago.

In March 1972 petitioner applied to register to vote in Monterey County. He was refused registration by respondent Monterey County Clerk on the sole ground that he had been convicted of a felony and had not obtained a pardon from the Governor.

Petitioner Gill is a 45-year-old winery worker, married, with four children. He was convicted in 1952 and 1967 of second degree burglary, and in 1957 of forgery. He avers that his offenses arose out of efforts to obtain money to support a narcotics addiction. On each conviction he served some time in prison, followed by a successful parole.

In April 1972 petitioner applied to register to vote in Stanislaus County. He was refused registration by respondent Stanislaus County Clerk on the sole ground of his prior felony convictions.[1]

Petitioners invoke the original jurisdiction of this court, and seek

---

[1]The remaining petitioners are the League of Women Voters and three nonprofit organizations which support the interests of ex-convicts. The Secretary of State is named as a respondent in his capacity of chief elections officer of California. Upon application we ordered the Mendocino County Clerk joined as an additional party respondent.

relief by writ of mandate. For the reasons stated in *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, footnotes 1 and 2 [96 Cal.Rptr. 697, 488 P.2d 1], the case falls within the limited category in which we deem it proper to exercise original jurisdiction, and the prayer is for the appropriate remedy. (Accord, *Young* v. *Gnoss* (1972) 7 Cal.3d 18, 21 [101 Cal. Rptr. 533, 496 P.2d 445]; *Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 750-751 [100 Cal.Rptr. 290, 493 P.2d 1154].)

Our alternative writ of mandate directed that respondents "register to vote all ex-felons whose term[s] of incarceration and parole have expired and who upon application demonstrate that they are otherwise fully qualified to vote," or show cause why this should not be done. The Clerks of San Luis Obispo, Monterey and Stanislaus Counties decided not to contest the issue and advised the court they will hereafter register all such ex-felons who apply, presumably including the present petitioners. It does not follow, however, that this proceeding should be dismissed as moot. The acquiescence of the three named county clerks is in no way binding on election officials of the 55 other counties of California in which the petitioners might choose to reside. Moreover, it is undisputed that in many of those other counties there are ex-felons among the resident population who have been or would be refused registration on the precise ground here challenged.[2] ■ The case thus poses a question which is of broad public interest, is likely to recur, and should receive uniform resolution throughout the state. In such circumstances we deem it appropriate to exercise our inherent discretion to resolve the issue, "even though an event occurring during its pendency would normally render the matter moot." (*In re William M.* (1970) 3 Cal.3d 16, 23 [89 Cal.Rptr. 33, 473 P.2d 737]; accord, *Liberty Mut. Ins. Co.* v. *Fales* (1973) 8 Cal.3d 712, 715-716 [106 Cal.Rptr. 21, 505 P.2d 213], and cases cited; see also *Roe* v. *Wade* (1973) 410 U.S. 113, 124-125 [35 L.Ed.2d 147, 161-163, 93 S.Ct. 705].) This rule is particularly applicable to challenges to the validity of election laws. (See, e.g., *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 719-720 [94 Cal.Rptr. 602, 484 P.2d 578]; see also *Goosby* v. *Osser* (1973) 409 U.S. 512, 514, fn. 2 [35 L.Ed.2d 36, 39-40, 93 S.Ct. 854].)

---

[2]Exact figures are difficult to obtain. Obviously almost every person convicted of felony and sentenced to prison sooner or later becomes an "ex-felon," and petitioners estimate there are 100,000 such persons in California today. Only those who wish to vote and who live in counties which refuse to register them, of course, are relevant here. Nevertheless we may fairly infer that their number is not insignificant, in view of (1) a recent survey of county election practices conducted by the Secretary of State, disclosing a wide variety of crimes which have been deemed to disqualify ex-felon applicants from voting, and (2) the strong likelihood that additional ex-felons have been discouraged by these laws and practices from even applying to register.

One further preliminary point requires discussion. At the time petitioners were refused registration, respondents' constitutional authority was former article II, section 1, of the California Constitution, which provided in part that "no alien ineligible to citizenship, no idiot, no insane person, no person convicted of any infamous crime, no person hereafter convicted of the embezzlement or misappropriation of public money, and no person who shall not be able to read the Constitution in the English language and write his or her name, shall ever exercise the privileges of an elector in this State; . . ." By the passage of Proposition 7 at the November 7, 1972, general election the people repealed this language and substituted therefor the following new article II, section 3: "The Legislature shall prohibit improper practices that affect elections and shall provide that no severely mentally deficient person, insane person, person convicted of an infamous crime, nor person convicted of embezzlement or misappropriation of public money, shall exercise the privileges of an elector in this state." We consider the effect, if any, of this amendment.

■ It is first apparent that whereas the former section itself prohibited all persons convicted of an "infamous crime" from voting, the new section declares that "The Legislature shall provide" for that result. We apprehend no difference in substance. As we explained in *Otsuka* (64 Cal.2d at pp. 607-608), since its first session the Legislature has often undertaken to implement the voting disqualifications of the Constitution, and the present Elections Code contains a number of statutes bearing on the exclusion of ex-felons from the franchise.[3] Petitioners candidly concede that the passage of Proposition 7 cannot reasonably be construed as an implied repeal of all such provisions, wiping the statute books clean for future legislation on the same subject. Repeals by implication are not favored (*Warne* v. *Harkness* (1963) 60 Cal.2d 579, 587-588 [35 Cal.Rptr. 601, 387 P.2d 377]), and at no time in the progress of Proposition 7 through the Legislature or during its presentation to the voters was there the slightest indication it was intended to have so drastic a result. It follows that the addition of the words, "The Legislature shall provide," must be interpreted merely as an express recognition of the legislative authority which has in fact been exercised since the earliest days of our state government. And in so specifying, new article II conforms its language with that of article

---

[3]Sections 310 and 321 provide that the affidavit of registration shall show whether the affiant has been convicted of "a felony which disqualifies him from voting." Sections 383, 389, and 390 direct the county clerk to cancel the registration of all voters who have been convicted of "any infamous crime or of the embezzlement or misappropriation of any public money." Sections 14240 and 14246 permit a voter's qualifications to be challenged on the ground that he has been convicted of "a felony" or of "the embezzlement or misappropriation of public money."

XX, section 11, which has provided since its adoption in 1879 that "Laws shall be made" to exclude from voting persons convicted of bribery, perjury, forgery, malfeasance in office, "or other high crimes." (See also Const. of 1849, art. XI, § 18.)

■ The second relevant change in wording brought about by the adoption of new article II, section 3, is the deletion of the word "ever" from the provision of former article II, section 1, that no person convicted of an infamous crime "shall ever exercise the privileges of an elector in this State." Again we perceive no change in legal effect. Even under the prior language a person denied the right to vote by reason of conviction of crime did not in actuality remain "forever" disfranchised: as we pointed out in *Otsuka* (at p. 604 of 64 Cal.2d), the Legislature has expressly provided for restoration of the right to vote to such persons "either by court order after completion of probation (Pen. Code, § 1203.4) or, if a prison term was served, by executive pardon after completion of rehabilitation proceedings (Pen. Code, §§ 4852.01-4852.17)." And no such legislation was necessary, of course, to restore the right to vote to a previously insane person who recovered his sanity, or to a former illiterate who achieved literacy. Accordingly, the sole possible meaning of the word "ever" as used in former article II, section 1, was that "at no time in the future" would a person under constitutional disqualification from voting be allowed to vote. Thus the word was merely emphatic surplusage, and with its deletion the Constitution reverted in this respect to the simpler language of the first such provision in California law.[4]

We conclude that under both the present and former article II of our Constitution, the controlling issue is whether the disfranchisement of all persons who have been convicted of crime violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.

When this issue was presented to us in *Otsuka* v. *Hite* (1966) *supra,* 64 Cal.2d 596, we resolved it by invoking the then current rules for applying the equal protection clause to a restriction on a fundamental interest

---

[4] Article II, section 5, of the Constitution of 1849 declared that "No idiot or insane person, or person convicted of any infamous crime, shall be entitled to the privileges of an elector."

There is no merit in petitioners' argument that deletion of the word "ever" signifies that a person convicted of crime is hereafter disfranchised only so long as he is on probation or is serving his sentence. In drafting the amendments which eventually became new article II, the California Law Revision Commission proposed express language to limit disfranchisement to that period. (Cal. Const. Revision Com., Proposed Revision of the Cal. Constitution (1970) pt. 2, p. 18.) The Legislature, however, declined to adopt the change when it submitted Proposition 7 to the voters.

such as the franchise. We began by identifying the "compelling state interest" served by denying ex-felons the right to vote. (*Id.* at pp. 602-603.) That interest, we determined, was "to protect 'the purity of the ballot box' against abuses by morally corrupt and dishonest voters operating to the detriment of the electorate as a whole" (*id.* at p. 611)—in short, to deter election fraud.

We then turned to the second branch of the prevailing equal protection test, namely, an inquiry into whether the restriction was "drawn with sufficient specificity." (*Id.* at p. 603.) At the time of *Otsuka*, however, the contours of that requirement had not been clearly delineated by the United States Supreme Court. The most recent authority then was *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079], filed just 60 days before *Otsuka*. In holding that a state poll tax violated the equal protection clause, the high court reasoned (at p. 666 [16 L.Ed.2d at p. 172]) that "Voter qualifications have *no relation* to wealth nor to paying or not paying this or any other tax." (Italics added; fn. omitted.)[5] Hence it was still generally believed that the requirement of specificity was satisfied if the court could find a "reasonable relationship" between the restriction and the articulated state interest.

Our analysis in *Otsuka* followed the traditional path. We began (at p. 603) by quoting *McLaughlin* v. *Florida* (1964) 379 U.S. 184, 191 [13 L.Ed.2d 222, 228, 85 S.Ct. 283], for the proposition that "The courts must reach and determine the question whether the classifications drawn in a statute are *reasonable* in light of its purpose." (Italics added.) We then demonstrated the "unreasonableness" of a classification which disfranchises all ex-felons without distinction: raising the possibility of citizens losing the right to vote upon conviction of felonies of a comparatively minor nature, we cited *Harper* for the conclusion that "No *reasonable relation* is apparent between this result and the purpose of protecting the integrity of the elective process." (Italics added.) Such malum prohibitum conduct, we reiterated, may be "totally *unrelated* to the goal of preservation of the integrity of the elective process." (Italics added; fn. omitted.) (*Id.* at p. 606.)

Accordingly, in order to save the constitutionality of article II we held that it could be permitted to disfranchise only those voters who had been convicted of a certain limited class of offenses which we defined as fol-

---

[5] It was only several years later and with the advantage of hindsight that we were able to view *Harper* as a transitional decision, the "implication" of which was that "more than 'rationality' must be demanded of state voter qualifications." (*Castro* v. *State of California* (1970) 2 Cal.3d 223, 235 [85 Cal.Rptr. 20, 466 P.2d 244].)

lows (at p. 611): "the inquiry must focus more precisely on the nature of the crime itself, and determine whether the elements of the crime are such that he who has committed it *may reasonably be deemed* to constitute a threat to the integrity of the elective process." (Italics added; fn. omitted.) Finding no such threat in the fact that the plaintiffs in *Otsuka* had been convicted 20 years earlier of refusing to serve in the armed forces because of conscientious objections, we reversed a judgment upholding a refusal to register them as voters.

In the seven years since *Otsuka*, however, the test for judging the constitutionality of a state-imposed limitation on the right to vote has become substantially more strict. At least since 1969 it is not enough that there be a rational relation between the restriction and the compelling state interest; the restriction is now constitutionally permissible only if it is "necessary" to promote that interest, and to be "necessary" it must constitute, inter alia, the "least burdensome" alternative possible. We proceed to document this evolution of the law.

In *Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886], the United States Supreme Court was called upon to review the constitutionality of a New York statute which excluded from voting in school district elections persons who neither owned nor leased real property in the district, or who were not parents of children in the local schools. The court set forth the controlling test in the following language (at pp. 626-627 [23 L.Ed.2d at p. 589]): "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are *necessary* to promote a compelling state interest." (Italics added.)

The school authorities contended they had a compelling interest in limiting the right to vote in school district elections to persons "primarily interested in school affairs." The high court assumed arguendo that the claimed concern was legitimate, but emphasized (at p. 632 [23 L.Ed.2d at p. 592]) that the classifications resulting from the statute must nevertheless "be tailored so that the exclusion of appellant [a nonparent neither owning nor leasing real property in the district] and members of his class is *necessary* to achieve the articulated state goal." (Italics added; fn. omitted.) Invalidating the statute, the court held the classifications were not "necessary" in the sense that they were both overinclusive and underinclusive.[6] (Ac-

---

[6]"The classifications in [the New York statute] permit inclusion of many persons who have, at best, a remote and indirect interest in school affairs and, on the other hand, exclude others who have a distinct and direct interest in the school meeting decisions." (Fn. omitted.) (*Id.* at p. 632 [23 L.Ed.2d at pp. 592-593].)

cord, *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; *Turner* v. *Fouche* (1970) 396 U.S. 346 [24 L.Ed.2d 567, 90 S.Ct. 532]; *Evans* v. *Cornman* (1970) 398 U.S. 419 [26 L.Ed.2d 370, 90 S.Ct. 1752]; *Phoenix* v. *Kolodziejski* (1970) 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990].)

In two cases decided last term the United States Supreme Court struck down state-imposed restrictions on the franchise on the ground they were not "necessary" in yet another sense, i.e., they were not the least burdensome means available of achieving the articulated state interest. First, in *Bullock* v. *Carter* (1972) 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849], the court unanimously invalidated a Texas statutory scheme whereby certain candidates for public office were required to pay substantial filing fees for the right to run in primary elections. The court recognized that the state has a legitimate interest in regulating the number of candidates on the ballot and in protecting "the integrity of its political processes from frivolous or fraudulent candidacies." (*Id.* at p. 145 [31 L.Ed.2d at p. 101].) The court also conceded that large filing fees will tend in fact to limit the number of candidates on the ballot, and "There may well be some rational relationship between a candidate's willingness to pay a filing fee and 'the seriousness with which he takes his candidacy" (*id.* at pp. 145-146 [31 L.Ed.2d at p. 101]). Nevertheless the court ruled (at p. 146 [31 L.Ed.2d at p. 101]) not only that the filing fee requirement was both underinclusive and overinclusive, but also that "other means to protect those valid interests are available." The court did not articulate the "other means" intended, but we infer from its reliance on *Jenness* v. *Fortson* (1971) 403 U.S. 431 [29 L.Ed.2d 554, 91 S.Ct. 1970], that such means at least include the use of nominating petitions signed by a prescribed percentage of registered voters.

Even more in point is *Dunn* v. *Blumstein* (1972) 405 U.S. 330 [31 L.Ed.2d 274, 92 S.Ct. 995], decided a month after *Bullock.* At issue in *Dunn* was the constitutionality of the requirements of Tennessee law that a voter be a resident of the state for one year and of the county for 90 days in order to exercise the suffrage. The high court reiterated the strict equal protection test of *Kramer* (*id.* at p. 342 [31 L.Ed.2d at p. 284]), and emphasized in particular that "It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means which unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' [citations] and must be 'tailored' to serve their legitimate objectives. [Citation.] And if there are *other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity,* a State may not choose the

way of greater interference. If it acts at all, it must choose 'less drastic means.'" (Italics added.) (*Id.* at p. 343 [31 L.Ed.2d at p. 285].)

Tennessee first contended it had a compelling interest in "preserving the purity of the ballot box." The high court apparently found this phraseology somewhat overblown, calling it a "formidable sounding" state interest. (*Id.* at p. 345 [31 L.Ed.2d at p. 286].) But the court then conceded that when the purpose of the statutory scheme is narrowed down to prevention of election fraud by nonresidents' falsely swearing they are eligible to vote, it does constitute a legitimate governmental goal. Nevertheless, the court held that durational residence requirements were not "necessary" to achieve that goal because two less burdensome means of doing so were available.

First, the court stressed that early abuses have been eliminated by the development of elaborate procedural safeguards governing election practices: "Durational residence laws may once have been necessary to prevent a fraudulent evasion of state voter standards, but today in Tennessee, as in most other States, this purpose is served by a system of voter registration. [Citations.] Given this system, the record is totally devoid of any evidence that durational residence requirements are in fact necessary to identify bona fide residents." (Fn. omitted.) (*Id.* at p. 346 [31 L.Ed.2d at p. 286].)

Second, the court gave full weight to the fact that election fraud in Tennessee is also punishable as a crime: "Our conclusion that the waiting period is not the least restrictive means necessary for preventing fraud is bolstered by the recognition that Tennessee has at its disposal a variety of criminal laws which are more than adequate to detect and deter whatever fraud may be feared." (Fn. omitted.) (*Id.* at p. 353 [31 L.Ed.2d at p. 290].) After reviewing a half-dozen Tennessee statutes defining "offenses to deal with voter fraud," the court concluded (at pp. 353-354 [31 L.Ed.2d at p. 291]): "Where a State has available such remedial action to supplement its voter registration system, it can hardly argue that broadly imposed political disabilities such as durational residence requirements are needed to deal with the evils of fraud." (See also *United States* v. *State of Texas* (W.D.Tex. 1966) 252 F.Supp. 234, 251, fn. 71, motion to affirm granted without opinion, 384 U.S. 155 [16 L.Ed.2d 434, 86 S.Ct. 1383].)[7]

---

[7]As an additional compelling state interest, Tennessee urged that long-time residents are more likely to vote intelligently because they are more informed about local issues. Without deciding whether this is a legitimate state concern, the court ruled that durational residence requirements are both underinclusive and overinclusive for this purpose, and concluded: "Given the exacting standard of precision we require of statutes affecting constitutional rights, we cannot say that durational residence requirements are necessary to further a compelling state interest." (*Id.* at p. 360 [31 L.Ed.2d at p. 294].)

This constitutional evolution finds its parallel in the decisions of our court since *Otsuka*. To begin with, in *Castro v. State of California* (1970) *supra,* 2 Cal.3d 223, 235, we explicitly recognized for the first time that in *Kramer* the United States Supreme Court "announced the new constitutional standard" discussed above. Applying that standard, we reviewed a requirement in the very constitutional provision here in issue—former article II, section 1—that voters be literate in the English language. We began by identifying a compelling state interest served by that requirement, namely, "California's concern that those of her citizens who are eligible to vote likewise be capable of informed decisions on matters submitted to the electorate" (*id.* at p. 237). But the remainder of our opinion was devoted to showing that literacy in English is not "necessary" to promote that concern because of the existence of a reasonable alternative, i.e., access by persons literate in Spanish to spoken or printed sources of political information in the Spanish language comparable to those available in English. (*Id.* at pp. 238-242.) As to such persons, we concluded, the English literacy requirement could not constitutionally be applied.[8]

In a group of cases after *Castro* not involving the exercise of the franchise but challenging statutes affecting other fundamental rights or based on suspect classifications, we likewise held that a restriction which is not the least burdensome available is not "necessary" to promote any state interest.[9] In *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999], we assumed arguendo that imprisonment of indigent defendants sentenced to pay a fine served the state's claimed purposes of collecting such fines and rehabilitating the offenders. We concluded, however, that imprisonment was not "necessary" to promote either purpose because the state has available to it alternative and less burdensome means of enforcing payment of fines. (*Id.* at pp. 114-115.)

Again, in *Zeilenga v. Nelson* (1971) *supra,* 4 Cal.3d 716, *Camara v. Mellon* (1971) 4 Cal.3d 714 [94 Cal.Rptr. 601, 484 P.2d 577], and *Thompson v. Mellon* (1973) *ante,* p. 96 [107 Cal.Rptr. 20, 507 P.2d 628], we held that residence requirements of five, three, and two years respectively for candidacy for public office were not necessary to insure that the candidate was knowledgeable about local conditions, because such require-

---

[8]Although vacated on other grounds (403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224]), our decision in *Westbrook v. Mihaly* (1970) 2 Cal.3d 765, 788-795 [87 Cal.Rptr. 839, 471 P.2d 487], adopted a similar analysis in invalidating the requirement of two-thirds approval of those voting for passage of local general obligation bond issues.

[9]In two additional decisions we found no compelling state interest whatever, and therefore did not reach the question of necessity. (*Raffaelli v. Committee of Bar Examiners* (1972) 7 Cal.3d 288, 301 [101 Cal.Rptr. 896, 496 P.2d 1264]; *In re Gary W.* (1971) 5 Cal.3d 296, 308 [96 Cal.Rptr. 1, 486 P.2d 1201].)

ments were not the "least restrictive method" of doing so. (*Id.* at p. 723.) In *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], we ruled that the prohibition against women bartenders was not necessary to prevent improprieties in the sale of alcoholic beverages because that evil "can be directly prevented through non-discriminatory legislation" such as general regulatory and penal statutes. (*Id.* at pp. 20-21.) And in *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187], we declared that California's school financing system was not "necessary" to promote either of the two compelling interests asserted, i.e., administrative and fiscal control over the schools at the local level. (*Id.* at pp. 610-611.)

Finally, we applied this test in a recent voting rights case. The issue in *Young* v. *Gnoss* (1972) *supra,* 7 Cal.3d 18, was the constitutionality of the requirements of California law that a voter be a resident of the county for 90 days and of the precinct for 54 days in order to exercise the suffrage. After rejecting certain claimed justifications for these durational residence requirements as insufficiently compelling (*id.* at pp. 24-26), we considered the asserted need to furnish local election officers with affidavits of registration and indexes of registered voters so as to permit identification of prospective voters. The timely delivery of such documents, we said, is "essential to the conduct of the election, and constitutes a compelling governmental interest. But the question remains whether the closing of registration 54 days before the election is *necessary* to achieve that goal." (Italics added.) (*Id.* at p. 26.)

We found no such necessity. Instead, we emphasized that alternate means were available to solve the problem of a last-minute influx of registrations, e.g., by delivering the affidavit books and voter indexes in two cycles rather than one. (See also Stats. 1972, ch. 1356.) We therefore concluded (at pp. 26-27) that to cut off all registration 54 days before the election in order to promote this governmental purpose "is *not* the method which is the least burdensome on the exercise of the right of suffrage within the meaning of *Dunn.*" (Italics in original.)

In the light of this evolution of the law of equal protection, the analysis in *Otsuka* of the constitutionality of disfranchising persons convicted of crime appears no longer adequate.[10] For present purposes we may adhere

---

[10]For the same reason, three federal cases on disfranchisement of ex-felons are no longer persuasive. (*Green* v. *Board of Elections of City of New York* (2d Cir. 1967) 380 F.2d 445; *Kronlund* v. *Honstein* (N.D.Ga. 1971) 327 F.Supp. 71; *Beacham* v. *Braterman* (S.D.Fla. 1969) 300 F.Supp. 182, motion to affirm granted without opinion, 396 U.S. 12 [24 L.Ed.2d 11, 90 S.Ct. 153].) Later federal decisions have ap-

to the determination in *Otsuka* that the purpose of that disfranchisement is to deter election fraud; but we must now also consider whether so drastic a remedy is "necessary in the sense that it is the least burdensome means available to achieve that goal." (*Young* v. *Gnoss* (1972) *supra*, 7 Cal.3d 18, 22.) We shall find the answer to our inquiry, as did the United States Supreme Court in *Dunn,* by examining the state's "total statutory scheme for regulating the franchise." (405 U.S. at p. 346 [31 L.Ed.2d at p. 286].)

In the early years of California political history, that scheme was rudimentary at best. The first act to regulate elections (Stats. 1850, ch. 38, p. 101) included only a handful of sections governing the casting and counting of votes. The statute declared that "The voting shall be by ballot" (§ 24), but made no provision for furnishing official ballots printed by the state and uniform in appearance and content. Instead, each voter brought his own ballot or "ticket" to the polls, consisting of a piece of paper on which he had written—or, more commonly, a political party or candidate had printed—his choices for the various offices.[11]

Although challenges were permitted (§§ 27-31), no voter was required to register, and the ballots were obviously not numbered. The statute simply provided (§ 25) that "Whenever any person offers to vote, the Inspector shall pronounce his name in an audible voice, and if there be no objection to the qualification of such person as an elector, shall receive his ballot, and in the presence of the other Judges put the same, without being opened or examined, into the ballot box." The system thus made it possible for unqualified persons such as nonresidents or aliens to vote, and for a voter in a single election to cast a ballot more than one time or at more than one polling place. Moreover, "Because the ballot box usually stood

---

propriately distinguished these precedents. (*Dillenburg* v. *Kramer* (9th Cir. 1972) 469 F.2d 1222, 1225-1226; *Stephens* v. *Yeomans* (D.N.J. 1970) 327 F.Supp. 1182, 1185-1187.)

[11]"The tickets were merely long, narrow slips of paper, headed by a vignette, on which were printed the names of a party's candidates for each office. They were given out to the faithful on election day by party ticket peddlers who stationed themselves on the streets and corners around the polls. This system was frequently abused. In some of the more partisan wards a voter could search blocks and blocks before finding a consentient ticket peddler. Even with ticket in hand the elector had to maintain his vigilance, for it was not uncommon for contending factions or parties to counterfeit their opponents' tickets, substituting one or two of their own for the names listed on the regular ticket. Under these circumstances, if the elector was not wary, he might then vote for a couple of opposition candidates, while under the impression he was casting a straight party ticket." (Petersen, *The Struggle for the Australian Ballot in California* (1972) 51 Cal. Hist. Q. 227-228; see also *Kirk* v. *Rhoads* (1873) 46 Cal. 398, 406.)

in the center of a public room, secret voting was difficult and manipulation relatively easy." (Petersen, *op. cit., supra,* p. 229.)[12]

Finally, "The problem was compounded because the dominant political faction in a precinct, ward, or county, usually controlled the appointment of election officials. Therefore, even if the voting was conducted by the rules, it was uncertain whether the ballots would be honestly tabulated." (Petersen, *op. cit., supra,* p. 229.) Little assurance could be gained from the statute, which provided only that after closing the polls the election officials were to open the ballot box, count the ballots, and send the totals to the county clerk either by mail or "by private hand." (§§ 33-36.)

In such circumstances the disfranchisement of persons convicted of an "infamous crime" (§ 12) may well have been necessary to minimize the more egregious frauds practiced on the electorate by unscrupulous candidates or voters. But the law on this subject has not remained static. In the ensuing century there have been numerous movements for electoral reform, resulting in a complex series of amendments to the voting laws. To cite only the major legislative efforts to curb election fraud, we note that in 1866 the first voter registration act was adopted. (Stats. 1865-1866, ch. 265, p. 288.) In 1872 the new Political Code required that every ballot "be of paper uniform in size, color, weight, texture, and appearance" (§ 1187), specified in detail the size and content of the ballot (§ 1191), and directed the Secretary of State to procure and sell such paper to the public (§§ 1188-1189). The code also contained elaborate provisions designed to promote secrecy in voting by forbidding that a ballot be marked on the outside or folded in any manner intended to indicate its contents. (§§ 1196-1199, 1206-1207.)

Voting secrecy was assured, however, by the adoption of the Australian ballot two decades later. (Stats. 1891, ch. 130, p. 165.) Under this legisla-

---

[12]A contemporary eyewitness account of an early California election describes as follows a not uncommon method of manipulating available aliens: "The various candidates, for example, would round up these prospective voters like so many cattle, confine them in corrals (usually in the neighborhood of Boyle Heights), keep them in a truly magnificent state of intoxication until the eventful morning, and then put them in stages hired from either Banning or Tomlinson for the purpose; and from the time the temporary prisoners left the corral until their votes had been securely deposited, they were closely watched by guards. On reaching the voting place, the captives were unloaded from the stage like so much inanimate baggage, and turned over to friends of the candidate to whom, so to speak, for the time being they belonged. One at a time, these creatures were led to vote; and as each staggered to the ballot box, a ticket was held up and he was made to deposit it. Once having served the purpose, he was turned loose and remained free until another election unless, as I have intimated, he and his fellows were again corralled and made to vote a second or even a third time the same day." (Newmark, Sixty Years in Southern California (4th ed. 1970) p. 42.)

tion all ballots were furnished at public expense (§ 1), on paper bearing an undisclosed watermark (§ 12), consecutively numbered with a corresponding stub (§ 13), and printed with the names of the duly nominated candidates in alphabetical order (*ibid.*). In addition, private booths were provided for the actual marking of the ballots (§ 19); each voter received his ballot directly from the election official at the polls (§ 20); and in marking his ballot each voter was required to use a stamp and ink pad furnished in the voting booth (§ 21).

After several false starts, the Legislature has also taken advantage of various technological developments in the election process. Each such development, of course, has tended to make it more difficult for dishonest individuals to tamper with either the casting or the counting of the ballots. Thus in 1903 the use of voting machines was authorized, permitting mechanical tabulation of results. (Stats. 1903, ch. 226, p. 262; see also Stats. 1923, ch. 96, p. 182.) In 1949 the Legislature provided for punch-card voting and electromechanical tabulation. (Stats. 1949, ch. 41, p. 57.) And in 1953 it authorized the marking of ballots by specially prepared pencils, with consequent electronic tabulation of the vote. (Stats. 1953, ch. 1046, p. 2514.)

Taken together, these and other reforms of the past hundred years have radically diminished the possibility of election fraud in California. The voting and counting process is now thoroughly hemmed in by control mechanisms at every stage, so that deliberate irregularities, "if present today, are rare and have negligible effects on election results." (Note (1967) 14 U.C.L.A. L.Rev. 699, 702 (reporting that the Los Angeles County Registrar of Voters had received no complaints of this type for the previous 41 years).) In sum, it may have been feasible in 1850 to influence the outcome of an election by rounding up the impecunious and the thirsty, furnishing them with free liquor, premarked ballots, and transportation to the polls; to do so in 1973, if possible at all, would require the coordinated skills of a vast squadron of computer technicians.[18]

Turning to the second point emphasized in *Dunn*—the range of penal sanctions available to prevent election fraud—we observe a similar development. The California Constitution has directed since its inception that the right to vote shall be supported by laws not only regulating elections but also "prohibiting, under adequate penalties, all undue influence

---

[18]The Legislature itself has recognized the contemporary irrelevance of the availability of liquor to election results by repealing its long-standing ban on the sale of alcoholic beverages during polling hours. (Former Bus. & Prof. Code, § 25630, repealed by Stats. 1969, ch. 614, p. 1253.)

thereon from power, bribery, tumult, or other improper practice." (Const. of 1849, art. XI, § 18; Const. of 1879, art. XX, § 11; new art. II, § 3, eff. Nov. 8, 1972.) The response of the Legislature to this directive has grown dramatically over the years. The first election law denominated only eight offenses against the franchise, and all were punishable as misdemeanors. (Stats. 1850, ch. 38, pp. 110-111, §§ 98-105.) Today, in sharp contrast, the Elections Code punishes at least 76 different acts as felonies, in 33 separate sections; at least 60 additional acts are punished as misdemeanors, in 40 separate sections; and 14 more acts are declared to be felony-misdemeanors.[14] Among this plethora of offenses we take particular note, in the present connection, of the felony sanctions against fraudulent registrations (§ 220), buying and selling of votes (§§ 12000-12008),[15] intimidating voters

---

[14]We noted some of these sanctions in *Otsuka* (64 Cal.2d at p. 603, fn. 3), but of course did not view them in the light thereafter cast on the issue by *Dunn.*

[15]Certain of these provisions are especially elaborate:

*Section 12000:* "A person shall not directly or through any other person receive, agree, or contract for, before or during an election, any money, gift, loan, or other valuable consideration, office, place, or employment for himself or any other person for either:

"(a) Voting or agreeing to vote.
"(b) Coming or agreeing to come to the polls.
"(c) Refraining or agreeing to refrain from voting.
"(d) Voting or agreeing to vote for any particular person.
"(e) Refraining or agreeing to refrain from voting for any particular person."

*Section 12001:* "A person shall not directly or through any other person receive any money or other valuable thing, during or after an election, because he or any other person:

"(a) Voted or refrained from voting for any particular person.
"(b) Came to the polls or remained away from the polls.
"(c) Induced any other person to:
    "(1) Vote or refrain from voting.
    "(2) Vote or refrain from voting for any particular person.
    "(3) Come to or remain away from the polls."

*Section 12003:* "A person shall not directly or through any other person pay, lend, or contribute, or offer or promise to pay, lend, or contribute, any money or other valuable consideration to or for any voter or to or for any other  person to:

"(a) Induce the voter to:
    "(1) Vote or refrain from voting at any election.
    "(2) Vote or refrain from voting at an election for any particular person.
    "(3) Come to the polls at an election.
    "(4) Remain away from the polls at an election.
"(b) Reward the voter for having:
    "(1) Voted.
    "(2) Refrained from voting.
    "(3) Voted for any particular person.
    "(4) Refrained from voting for any particular person.
    "(5) Come to the polls at an election.
    "(6) Remained away from the polls at an election."

Each of these offenses is punishable by an indeterminate prison term of one to seven years. (§ 12012.)

by threat or bribery (§§ 29130-29135), voting twice, or fraudulently voting without being entitled to do so, or impersonating another voter (§§ 14403, 29430-29431), fraud or forgery in casting absentee ballots (§§ 14690-14692), tampering with voting machines (§ 15280) or ballot boxes (§§ 17090-17092), forging or altering election returns (§§ 29100-29103), and so interfering "with the officers holding an election or conducting a canvass, or with the voters lawfully exercising their rights of voting at an election, as to prevent the election or canvass from being fairly held and lawfully conducted" (§ 17093).[16] These sanctions are even more pervasive than those characterized by the Supreme Court in *Dunn* as "more than adequate to detect and deter whatever fraud may be feared." (405 U.S. at p. 353 [31 L.Ed.2d at p. 290].)

In holding that a challenge to state laws identical to those here in issue required the convening of a three-judge federal court, the Ninth Circuit Court of Appeals reasoned: "Earlier in our constitutional history, laws disenfranchising persons convicted of crime may have been immune from attack. But constitutional concepts of equal protection are not immutably frozen like insects trapped in Devonian amber. 'Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change.' (Harper v. Virginia Board of Elections (1966) 383 U.S. 663, 669, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169.) In the wake of the many decisions dismantling restrictions on voting rights, we cannot say that this challenge to Washington laws is now unsubstantial." (*Dillenburg* v. *Kramer* (1972) *supra*, 469 F.2d 1222, 1226.)[17]

The same challenge to California's laws on this topic is not only substantial, it is meritorious. ▆ For the reasons stated in *Dunn,* we hold that the enforcement of modern statutes regulating the voting process and penalizing its misuse—rather than outright disfranchisement of persons convicted of crime—is today the method of preventing election fraud which is the least burdensome on the right of suffrage. It follows that such disfranchisement is not "necessary," within the meaning of *Dunn* and its predecessors, to achieve that goal. ▆ We conclude that, as applied to all

---

[16]In addition, the code contains a great many directives of all kinds to the various participants in the election process, and declares generally that "Every person who willfully violates *any* of the provisions of the laws of this State relating to election is, unless a different punishment is prescribed by this code, punishable by a fine not exceeding one thousand dollars ($1,000) or by imprisonment in the state prison not exceeding five years, or by both." (Italics added.) (§ 29001; see also § 29002.)

[17]Similarly, the United States Supreme Court recently ruled that a substantial constitutional issue was presented by an attack on a Pennsylvania statute which prohibits from voting all persons confined in penal institutions awaiting trial. (*Goosby* v. *Osser* (1973) *supra*, 409 U.S. 512.)

ex-felons whose terms of incarceration and parole have expired, the provisions of article II and article XX, section 11, of the California Constitution denying the right of suffrage to persons convicted of crime, together with the several sections of the Elections Code implementing that disqualification (*ante,* fn. 3), violate the equal protection clause of the Fourteenth Amendment.[18]

The alternative writ, having served its purpose, is discharged, and the petition for peremptory writ is denied. All parties shall recover their costs from the State of California. (See Code Civ. Proc., § 1095.)

Wright, C. J., McComb, J., Tobriner, J., Burke, J., Sullivan, J., and Taylor, J.,* concurred.

---

[18]Respondent Secretary of State asks us to reaffirm the constitutionality of statutes which deny the suffrage to all felons who are currently incarcerated or on parole. (Pen. Code, §§ 2600, 3054.) The question whether the disfranchisement of such persons is today constitutionally permissible is not presented in the case at bar. The individual petitioners herein have all been discharged from prison and have successfully completed their parole; the prayer of the petition requests only that respondents be directed to register ex-felons whose terms of incarceration and parole have expired, and our alternative writ was so limited.

*Assigned by the Chairman of the Judicial Council.