664 F.2d 391
 Gary ALLEN, individually and on behalf of all others
similarly situated, Appellee,
v.
James B. ELLISOR, individually and as Executive Director of
the South CarolinaElection Commission, Appellant,
and
Joan B. Blackwell, Norma D. Myers, Marie H. Walker, Jane
Crayton Davis, individually and as members of the Board of
Registration of Aiken County, SouthCarolina and on behalf of
all others similarly situated, Defendants.
 No. 79-1539.
 United States Court of Appeals,
Fourth Circuit.
 Heard En Banc Nov. 11, 1980.
Decided Jan. 6, 1981.
 
 Treva G. Ashworth, Senior Asst. Atty. Gen., Columbia, S. C. (Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Jr., Deputy Atty. Gen., James M. Holly, State Atty., Columbia, S. C., on brief), for appellant.
 Armand Derfner, Charleston, S. C. (Epstein, McClain & Derfner, Charleston, S. C., Laughlin McDonald, Neil Bradley, H. Christopher Coates, Atlanta, Ga., on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, WINTER, BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE and ERVIN, Circuit Judges, sitting en banc.
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 The plaintiff, a convicted forger, sues individually and as representative of others similarly situated, asserting the unconstitutionality of the South Carolina statute disqualifying persons for conviction of crime. He bases his claim of unconstitutionality on two grounds: the first is the alleged invalidity of the statute under the equal protection clause in its designation of disqualifying offenses; the second is the alleged intentional discrimination on the basis of race in the enactment of the statute. The first raises a question of law resolvable on the face of the statute itself; the second presents a factual issue to be resolved on the proper record. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). After answer by the defendants, the plaintiff sought and was granted, without objection, class certification. At this point the defendants, who are the South Carolina Election Commission and the Board of Registration of Aiken County, moved for summary judgment. The plaintiff responded by seeking summary judgment. The District Judge, after argument, filed his opinion, 477 F.Supp. 321, finding the statute facially invalid under the equal protection clause of the fourteenth amendment, and granting judgment in favor of the plaintiff accordingly. Having held the statute invalid on that ground, he found no occasion to consider the plaintiff's claim of racial discrimination. From that judgment entered in favor of plaintiff on his claim of facial invalidity of the statute, the defendants have appealed. We reverse and remand for further proceedings.
 
 The statute under attack provides:
 
 2
 Persons convicted of burglary, arson, obtaining goods or money under false pretenses, perjury, forgery, robbery, bribery, adultery, bigamy, wife-beating, housebreaking, receiving stolen goods, breach of trust with fraudulent intent, fornication, sodomy, incest, assault with intent to ravish, larceny, murder, rape or crimes against the election laws shall be disqualified from being registered or voting, unless such disqualification shall have been removed by pardon.[1]
 
 
 3
 The alleged rationalization for the plaintiff's claim of facial invalidity of the statute, the only issue resolved by the District Judge and the one on which his judgment was based, was what the plaintiff asserted to be the lack of uniformity in the statute's designation of disqualifying offenses. In reaching this conclusion the District Judge applied the standard equal protection test in voting rights cases without considering the critical threshold question whether statutes disqualifying for crime such as the one under attack, which are expressly authorized under § 2 of the fourteenth amendment, were reviewable for compliance with the equal protection mandate imposed by § 1 of the same amendment on the basis of the lack of uniformity of offenses. In Green v. Board of Elections of City of New York, 380 F.2d 445 (2d Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968), however, the Court had confronted this threshold question of the applicability of the equal protection clause to a state statute disqualifying for crime enacted under the authority of § 2 of the fourteenth amendment and had found that review of such statutes under the equal protection clause was not required.
 
 
 4
 In Green a New York statute which disqualified any person "convicted of a felony" was challenged under the equal protection clause. In sustaining the statute Judge Friendly, speaking for the Court, held the general language relating to equal protection in § 1 of the fourteenth amendment did not apply to or limit the power of the state under § 2 of the amendment to disqualify persons convicted of crime, saying:
 
 
 5
 Plaintiff places heaviest weight on the equal protection clause of the Fourteenth Amendment, relied upon in such landmark decisions as the apportionment cases, Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and the voter qualification cases, Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), and Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). But none of those decisions intimates that the states are without power to continue their historic exclusion from the franchise of persons convicted of all or certain types of felonies. Even though the precise issue has not arisen before the Supreme Court, the propriety of excluding felons from the franchise has been so frequently recognized-indeed put forward by the Justices to illustrate what the states may properly do-that such expressions cannot be dismissed as unconsidered dicta. Id. 451.
 
 
 6
 A short time later the district court of New Jersey in Stephens v. Yeomans, 327 F.Supp. 1182 (D.N.J.1970), though, reached a contrary conclusion to that expressed by Judge Friendly in Green. It said:
 
 
 7
 We conclude, therefore, that the New Jersey statute which disenfranchises plaintiff (for crime) must be judged by the exacting equal protection standards laid down by the Supreme Court in the voter disqualification cases referred to hereinabove. The disqualification must bear a rational relationship to the achievement of a discernable and permissible state goal. To the extent that Davis v. Beason, 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1889), and Murphy v. Ramsey, 114 U.S. 15, 5 S.Ct. 747, 29 L.Ed. 47 (1885), indicate otherwise they must be considered as limited by the subsequent voting right cases discussed hereinabove.
 
 
 8
 How the purity of the electoral process is enhanced by the totally irrational and inconsistent classification set forth in N.J.S. 19:4-1 (2)-(5) is nowhere explained. We perceive no rational basis for the New Jersey classification. Certainly it cannot meet the exacting standard of precision required by the equal protection clause for a selective distribution of the franchise. We hold the classification set forth in N.J.S. 19:4-1 (2) through (5) to be invalid under that clause. Id. 1187-1188.
 
 
 9
 Two years later a three-judge court in this circuit, Fincher v. Scott, 352 F.Supp. 117 (3-judge ct. M.D.N.C.1972), was called upon to consider a like attack under the equal protection clause upon the North Carolina statute disqualifying from voting any person convicted of any "crime the punishment for which now or may hereafter be imprisonment in the State's prison, ...."[2] After recognizing that Stephens v. Yeomans was "the only example" of a decision sustaining such a claim, the Court, speaking through Judge Craven, dismissed that case with the crisp comment that "(w)e admire the technique (of the opinion in Stephens ) and would be persuaded by it but for what seems to us the compelling argument of history." Id. 118. The opinion then turned for authority to Judge Friendly's decision in Green and to Beacham v. Braterman, 300 F.Supp. 182 (3-judge ct. S.D.Fla.1969), aff'd without opinion, 396 U.S. 12, 90 S.Ct. 153, 24 L.Ed.2d 11 a decision in which a Florida statute disqualifying felons was held not to be subject to compliance with equal protection, and concluded by sustaining the North Carolina statute with this blunt and categorical ruling:
 
 
 10
 We think that a state may constitutionally continue the "historic exclusion" of felons from the franchise without regard to whether such exclusion can pass muster under the Equal Protection Clause. Supra 119.
 
 
 11
 Upon appeal Fincher, like Beacham, was affirmed by the Supreme Court without opinion, 411 U.S. 961, 93 S.Ct. 2151, 36 L.Ed.2d 681.[3]
 
 
 12
 In 1974 the Supreme Court itself addressed the issue decided in Fincher in Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). This case came to the Supreme Court by way of review of the California decision in Ramirez v. Brown, 9 Cal.3d 199, 107 Cal.Rptr. 137, 507 P.2d 1345 (1973). As background for the Supreme Court decision, we begin by looking at the State decision which was under review. The "controlling issue" in the State case, as phrased by the California court, and as recognized by the Supreme Court in Richardson, was "whether the disfranchisement of all persons who have been convicted of crime violates the equal protection clause of the Fourteenth Amendment to the United States Constitution." 107 Cal.Rptr. at 141, 507 P.2d at 1348-9; 418 U.S. at 33, 94 S.Ct. at 2660. Relying primarily on Kramer v. Union School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the State court had concluded that any statutory restriction by way of a disqualification on the right to vote was subject to review for compelling state interests under the equal protection clause of the fourteenth amendment. It found that the enforcement of "modern statutes regulating the voting process and penalizing its misuse-rather than outright disfranchisement of persons convicted of crime-is today the method of preventing election fraud" and it accordingly was not "necessary" to disenfranchise persons convicted of crime in order to preserve the integrity of the election process. Supra, 107 Cal.Rptr. at 149, 507 P.2d at 1357. On that reasoning it found the disqualification of ex-felons under the California statute invalid on federal equal protection grounds. Such was the case which was appealed to the Supreme Court and was decided under the title Richardson v. Ramirez.
 
 
 13
 In Richardson the Supreme Court proceeded to reverse the decision of the California court and to clarify once and for all the applicable constitutional equal protection principles in this context. It answered the "controlling issue" as phrased by the California court and held expressly and unequivocally that the power of the states to disqualify for crime under § 2 of the fourteenth amendment was not subject to the equal protection constraints of § 1 of the amendment. In reaching this conclusion, it significantly cited with approval Green, Fincher, and Beacham, all of which had expressed the same opinion, and it expressly found that Kramer, Dunn, and Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), and Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), all authorities cited by the California court in support of its contrary conclusion, were inapposite when applied to a state statute disqualifying for crime. 418 U.S. at 54, 94 S.Ct. at 2670. On the basis of this conclusion that the California court "had erred in measuring the disenfranchisement provisions against the standards established by the equal protection clause,"[4] the Supreme Court reversed the California court and sustained the facial validity of the California disqualification statute.
 
 
 14
 The decision in Richardson is generally recognized as having closed the door on the equal protection argument in a challenge to state statutory voting disqualifications for conviction of crime, which the plaintiff makes in this case. Thus in Tribe, American Constitutional Law, 771 (Foundation Press, 1978), the author puts it:
 
 
 15
 In Richardson v. Ramirez, the Supreme Court held that, because § 2 of the fourteenth amendment apparently contemplates the disenfranchisement of convicted criminals, the equal protection clause of the fourteenth amendment does not invalidate state laws which deny the ballot to ex-felons.
 
 
 16
 In The Supreme Court, 1973 Term, 88 Harv.L.Rev. 41 at 102 (1974), the author similarly summarized Richardson as holding "that in light of section 2 of the fourteenth amendment, which appears to countenance disenfranchisement of convicted criminals, that amendment's equal protection clause does not invalidate state laws which deny ex-felons the right to vote." Further, the commentator in the Note, The Disenfranchisement of Ex-Felons: A Cruelly Excessive Punishment, 7 Sw.L.Rev. 124 at 138 (1975) concluded that "(i)n Richardson v. Ramirez, the Supreme Court chose to align itself with the majority position (i. e., that expressed in Green, Fincher and Beacham ) by finding that the express language of section two of the fourteenth amendment compelled the conclusion that the California supreme court erred in holding that the state's disenfranchisement provision was unconstitutional as a violation of the equal protection clause," adding later: "(the) impact of the decision is obvious. For all intents and purposes the door has been closed on the equal protection argument (in voter disqualifications for conviction of crime)." Id. at 140. Likewise, in a Note, Constitutional Law-Fourteenth Amendment-Equal Protection-Voting Rights of Ex-Felons, 13 Duquesne Law Review, 130 at 133 (1974), the writer said the Supreme Court had accepted as its decision "the proposition argued by the petitioner that the express language of this section specifically excludes ex-felons from the more general protective principles enunciated in the equal protection clause." Finally, in 10 New England Law Review, 477 at 484-85 (1974), the author, after expressing the opinion that, "(a)lthough the Court's holding (in Richardson ) is not sound, it is unlikely in view of the 6-3 decision that the Court will reverse itself in the near future on the grounds of the Equal Protection Clause," and advises that future challenges to these disenfranchisement statutes rest on "A) the Eighth Amendment prohibition against cruel and unusual punishment, B) the constitutional right to travel, and C) the First Amendment right to freedom of political expression and association."[5] Perhaps even more persuasive of this conclusion is the fact that this is the way the dissenting opinion construed the prevailing opinion.
 
 
 17
 In light of the clear language of the majority in Richardson and of the uniform opinion that such decision foreclosed an equal protection challenge to a voter disqualification statute for conviction of crime, it is not surprising that a three-judge court in our own circuit had no difficulty a few years later in sustaining the Maryland statutes disqualifying from voting any person convicted of an "infamous crime" against an equal protection attack "because (the Maryland statutes) single(d) out certain convicted felons for the deprivation of the 'fundamental' right to vote." Thiess v. State Administrative Bd. of Elec. Laws, Md., 387 F.Supp. 1038, 1040 (D.Md.1974). The Court in that case said:
 
 
 18
 The contention that the Maryland statutes depriving convicted felons of their right to vote contravene the mandates of the Equal Protection Clause of the Fourteenth Amendment has been fully answered by the Supreme Court's decision in Richardson v. Ramirez, supra. Id. 1041.
 
 
 19
 It would seem that, as the comments quoted supra so clearly suggested and as Thiess held, Richardson should have finally put to rest any remaining doubt of the freedom from an equal protection challenge of a state statute disqualifying for crime. The plaintiff, however, argues in the face of Richardson that the power of the state to select disqualifying crimes immune from equal protection review extends only to the power to disqualify for "felonies." He goes further and posits that equal protection review of a statute identifying specifically the disqualifying crimes, as distinguished from one classifying them under a broad classification of "felonies," is actually necessary in order to meet constitutional requirements. Under this argument, all disqualifying statutes which identify the disqualifying crimes specifically, thus including some crimes as disqualifying and omitting others-a ground which would, according to a recent article, include the disqualifying statutes of twenty-two states-[6] would not be immune from equal protection review despite Richardson.
 
 
 20
 There is no language either in § 2 or in Richardson which justifies this distinction. Nor is a logical foundation for it apparent. Presumably, the rationale for this distinction urged by the plaintiff in the application of equal protection between a classification of "felonies" (immune from equal protection review) and classification based on specific crimes (not immune from equal protection review) is the assumption that "felonies" are sufficiently uniform in degree of culpability as to satisfy the equal protection test, whereas the identification of specific crimes of dissimilar or unequal seriousness creates such lack of uniformity in the application of a statute disqualifying for crime that the latter cannot qualify for exemption from equal protection review under § 2 of the fourteenth amendment. But there is as much lack of uniformity and similarity of culpability in a classification of "felonies" as in an identification of specific crimes. To state the point in another way, if uniformity is the test, a classification of "felonies" is as vulnerable to a claim of a violation of equal protection as is a classification consisting of various specific crimes. This point was made clear by the decision in Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412 (1966), the forerunner of the California case reviewed in Richardson, where the court demonstrated that, assuming that lack of uniformity in the seriousness of the disqualifying crimes may be deemed the test of immunity from equal protection analysis in this context, a statutory classification of "felonies" as disqualification for voting would group crimes so lacking in uniformity in their seriousness as itself to violate equal protection. In demonstrating this, the Court in Otsuka v. Hite said:
 
 
 21
 The unreasonableness of a classification disfranchising all former felons, regardless of their crime, is readily demonstrable: it raises the spectre of citizens automatically deprived of their right to vote upon conviction, for example, of seduction under promise of marriage (Pen.Code, § 268), failure to provide family support (Pen.Code, § 270), wife-beating (Pen.Code, § 273d), or second-offense indecent exposure (Pen.Code, § 311); worse yet, since conspiracy to commit a misdemeanor is itself a felony (Pen.Code, § 182, subd. 1), disfranchisement would automatically follow from conviction of conspiracy to operate a motor vehicle without a muffler (Veh.Code, § 27150) or to violate any other of the myriads of lesser misdemeanor statutes on the books. No reasonable relation is apparent between this result and the purpose of protecting the integrity of the election process. Id. 51 Cal.Rptr. at 290, 414 P.2d at 418.
 
 
 22
 Further proof of the complete lack of uniformity in designation of various offenses as felonies by the several states is evident in such statutes as those of Texas which catalogue as a felony stealing of any quantity of wool or edible meat but as a misdemeanor stealing larger quantities of cotton or edible vegetables see Note, The Need for Reform of Ex-Felon Disenfranchisement Laws, 83 Yale L.J., 580, 592, note 73 (1974), or such other statutes which make the determination whether a crime is a felony depend on the place of imprisonment, State v. Asfoor, 75 Wis.2d 411, 249 N.W.2d 529 (1977), State v. Geiger, 113 Ariz. 297, 552 P.2d 1191 (1976), and still other state statutes which make the determination on the basis of the actual sentence imposed, see United States v. Houston, 547 F.2d 104, 106 (9th Cir. 1976) (referring to California law). It is patent from these illustrations, as well as those instanced in Hite, that there is the greatest lack of uniformity in the serious character of the various crimes designated by the various states as felonies. Yet the plaintiff concedes that a statute which disqualifies for conviction of a felony would be invulnerable against an equal protection assault. If lack of uniformity will not render a classification for disqualification for conviction of a felony invalid under equal protection requirements, by the same reasoning such lack of uniformity will not operate to subject a statutory disqualification for conviction of specific crimes, even though such crimes may be different both in seriousness and in punishment, to equal protection constraint. In short, § 2 of the amendment immunizes any classification of disqualifying crimes, whether the classification is stated in terms of "felonies" generally, or of some felonies, or of certain specified crimes.[7]
 
 
 23
 Finally, the plaintiff presses the point that Richardson did recognize that a disenfranchising statute for crime was subject to equal protection scrutiny because the Court remanded that case to the state court for such scrutiny. This argument is based upon the failure of the plaintiff to distinguish between two "separate" and different claims of unconstitutional enactment (or facial invalidity of a statute) and the second the unconstitutional enforcement of a facially valid statute raised by the plaintiff in Richardson. But even though the statute is facially valid, it may be discriminatorily enforced and such discriminatory enforcement would be violative of equal protection.[8] In Richardson, the plaintiff alleged that, even if the statute in that case were valid on its face, it was being discriminatorily enforced and for this reason he was entitled to relief. In connection with this claim of unequal enforcement, the Supreme Court noted that the record indicated that there was a complete "lack of uniformity across the state" in applying the statute, so much so "that a person convicted of almost any given felony would find that he is eligible to vote in some California counties and ineligible to vote in others." Id. 418 U.S. at 33-4, n. 12, 94 S.Ct. at 2661, n. 12.[9] While the Supreme Court in Richardson had decided that the California statute as enacted was valid on its face under the equal protection clause of the fourteenth amendment and that the California court had erred in holding to the contrary, it did not have before it any ruling by the California court on the claim of unequal enforcement made by the plaintiff in that case. And it was this issue of unequal enforcement, not the previously resolved issue of the statute's facial invalidity, which the Supreme Court chose to remand to the California court for resolution. Since the plaintiff in this case, contrary to the position of the plaintiff in Richardson, does not claim unequal enforcement of the South Carolina disqualification statute, there is no need to remand this case for consideration of a claim of unequal enforcement.
 
 
 24
 The plaintiff has, however, asserted a claim that was not raised in Richardson. He has alleged in general terms that the statute challenged here is racially tainted. Since it found the statute facially unconstitutional, the district court did not find any need to consider this issue. We have, however, concluded that the statute is facially valid. It is, therefore, necessary that this additional ground raised by the plaintiff be disposed of. Both the plaintiff and the defendants have sought to have us decide this claim on the record before us. Unfortunately, there is not a record before us on which we can properly rule on the claim. The plaintiff has referred to certain historical writings in support of his contention. These writings were, however, not made a part of the record below. Moreover, they refer to the statute as it was originally enacted more than eighty years ago and do not discuss or consider the statute as it has been several times amended or revised in recent years. The defendants, on the other hand, argue to us that there have been one or more revisions of the statute, all of which were subsequent to the effective date of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971, et seq. These revisions were duly submitted, the defendants contend, to the Attorney General, who, on review, did not find that they were racially discriminatory. 42 U.S.C. § 1973c. These facts pressed on us by the defendants again are not of record before us. Faced with an unproven record, we can only do what the court in Richardson did, i. e., reverse the ruling by the district court that the statute is on its face unconstitutional under the equal protection clause, but remand the cause to the district court for the resolution of the plaintiff's second claim that the statute is racially tainted.
 
 
 25
 Accordingly the judgment of the district court is reversed and remanded solely for consideration by the District Court of the plaintiff's claim of racial discrimination.
 
 
 26
 REVERSED AND REMANDED.
 
 MURNAGHAN, Circuit Judge, concurring:
 
 27
 I accept the conclusion of Judge Russell, deriving from searching analysis, that equal protection as it appears in § 1 of the Fourteenth Amendment, and as, in that context, it has been elaborated, does not afford plaintiffs a route to success in an attack charging facial invalidity of the South Carolina disenfranchisement statute. However, I do not perceive it as necessary or desirable to reach the opposite extreme, namely that no equal protection considerations regulate the language of § 2 of the Fourteenth Amendment relating to disenfranchisement for crime in any manner whatever.
 
 
 28
 The absence of the words "equal protection" in the Fifth Amendment has not operated to exclude such a concept from the arsenal of protection spelled out in that Amendment. E. g. Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). That does not, and should not, surprise us, for, if there be one constitutional dogma that pins the fabric of tolerable government together, it is the concept of equality. Elusive it often is to determine what is equality, but we are unflaggingly committed to the endeavor.[1]
 
 
 29
 Admittedly in differing modes, depending on the specific subject matter dealt with, nevertheless, in some variation, the concept of equal protection is, absent the most explicit language to the contrary, to be implied throughout the entire length and breadth of the Constitution.[2] There is no necessity to read all equal protection from § 2 of the Fourteenth Amendment to reach the result of the majority. It suffices to say, for the purposes of this case, that equal protection as defined and developed for purposes of § 1 of the Fourteenth Amendment is not applicable, and that the implied equal protection from § 2 itself is not invaded or denied. Equal protection for purposes of the Fifth Amendment is not, in all respects, identical with equal protection as it has evolved under § 1 of the Fourteenth Amendment. Hampton v. Mow Sun Wong, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495 (1976) makes clear that "the two protections are not always coextensive," "(a)lthough both Amendments require the same type of analysis." See also Bolling v. Sharpe, supra, 347 U.S. at 499, 74 S.Ct. at 694: "The 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,' and, therefore, we do not imply that the two are always interchangeable phrases."
 
 
 30
 Of course, in my view of things, it becomes necessary to consider the effects of application of the § 2 implied concept of equal protection to the instant case, even though the § 1 explicit "equal protection clause" has no direct part to play. The § 2 "implied equal protection" will perhaps be commencing, if not life, at least recognition with this litigation. It should not, at so nascent a stage, unnecessarily be made to measure questions any broader than those truly presented.
 
 
 31
 The class designation might well have been, and perhaps should have been, denied by the district judge on the grounds that there is lacking a sufficient identity of interest to link the claims of an actual forger to those of a supposed but unidentified, and maybe ephemeral, wife-beater.[3] The wife-beater, assuming someone actually convicted of that crime exists, can point to crimes of apparently equal or greater seriousness, which are not grounds for disenfranchisement. Wife-beaters and those who perpetrate the crimes of equal or greater seriousness do not necessarily possess the certain moral depravity of forgery specifically raising doubts as to the desirability of permitting anyone with that particular mind-set to vote.[4] Indeed a class designation broader than "all disenfranchised forgers, all those obtaining goods or money under false pretenses, all perjurers, all bribers, and all committing a breach of trust with fraudulent intent", it could be persuasively argued, would be inappropriate, because there are essential distinctions between those convicts and those convicted of other crimes listed in the statute.
 
 
 32
 Nevertheless, class status was accorded, and the defendants did not oppose that determination. Since the ultimate result will not differ, we have no need to resolve the question of whether the class designation could or should be revoked, on appeal, on a plain error basis.
 
 
 33
 Insofar as the broad gauged class action attack is concerned, first we consider the case solely of forgers. They cannot point to a crime of equal or greater seriousness which does not lead to disenfranchisement. And, if they could, the generalized seriousness of the offense of forgery, as it relates to the franchise, suffices to let it stand as a bar to voting, even though some other crime has eluded the legislative net. The forger, consequently, raises no substantial concerns, under such equal protection as is implied by § 2 of Article Fourteen.
 
 
 34
 The other crimes, conviction for which under the South Carolina statute disqualifies one from voting, are either (a) ones as to which the moral depravity may not relate to voting capacity (e. g. murder or incest), or (b) ones, in today's circumstances, as to which it may be doubted whether, in some cases at least, moral depravity is present at all (e. g. adultery).
 
 
 35
 However, to ascertain that a particular convict is denied equal protection when denied the right to vote, although he or she is in fact free of the disqualifying moral taint, requires proof of his or her individual circumstances. Plaintiffs have adduced no such proof. Because none of the disenfranchising crimes is ipso facto void for infringing Article Fourteen Section 2 equal protection guarantees, the broad assertions of facial invalidity must fail.
 
 
 36
 I agree, however, that remand is necessary to permit the plaintiff to assert the alternate grounds of alleged racial discrimination, never reached by the district judge. In the first place, if there were disenfranchisement on those grounds, nothing would curtail availability of the equal protection clause of the Fourteenth Amendment § 1. Article Fourteen § 2 relates only to abridgement of the right to vote for "participation in ... crime." Race is not a crime.
 
 
 37
 Much more directly, of course, Article Fifteen prohibits denial of the right to vote "on account of race...."
 
 
 38
 WINTER, Circuit Judge, dissenting in part and concurring in part:
 
 
 39
 It is my view that when a state, under the express authority of § 2 of the Fourteenth Amendment, undertakes to disenfranchise persons convicted of crime, it must nevertheless comply with the Equal Protection Clause contained in § 1 of the Fourteenth Amendment. On that premise I would conclude that S.C.Code § 7-5-120 (Proviso) (b) denies equal protection, because as the district court correctly concluded, the statute selects some crimes as disenfranchising offenses and omits others, some more serious, without justification. I would therefore affirm, and I respectfully dissent from the contrary holding. If, however, my view does not prevail, I agree with the majority that the case must be returned to the district court for trial on plaintiff's claim of racial discrimination.
 
 I.
 
 40
 I start with the legal basis for my premise. The states are not prevented by the Equal Protection Clause of the Fourteenth Amendment from disenfranchising persons convicted of felonies. It was so held in Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), with particular reliance on the language of § 2 of that amendment providing that the apportionment of representatives of a state shall be reduced if the right to vote is abridged "except for participation in rebellion, or other crime ...."[1] Nor is there doubt concerning the power of a state to disqualify some felons from voting while permitting others to vote. Richardson v. Ramirez, 418 U.S. at 53, 94 S.Ct. at 2670.
 
 
 41
 What this case is all about is whether there is any limitation on the right of a state to disenfranchise persons convicted of crime. I think that there is. The authority of the state to disenfranchise is, as Richardson v. Ramirez shows, derived from § 2 of the Fourteenth Amendment. That section follows § 1 which guarantees equal protection of the laws, and it is not lightly to be presumed that, having established a standard of even-handed, fair, rational state action in § 1, the framers of the amendment intended to scuttle that standard in permitting the states to disenfranchise those convicted of crime. Ramirez itself recognized that even with the enactment of disenfranchising legislation, equal protection considerations still applied. In Ramirez there was a claim that a total lack of uniformity in the enforcement of the disenfranchising legislation worked a "separate" denial of equal protection, and the Court remanded this aspect of the case for consideration in the first instance by the California court. Surely if the Equal Protection Clause regulates the enforcement of disenfranchising legislation, it is applicable to the enactment of such legislation, particularly the classifications which a legislative body may make.
 
 
 42
 I would hold that the Equal Protection Clause does so apply. No case holds to the contrary although I am well aware that dictum in at least three cases if read literally would support a contrary result. Those three cases are Green v. Board of Elections, 380 F.2d 445 (2 Cir. 1967), cert. denied, 389 U.S. 1048, 88 S.Ct. 768, 19 L.Ed.2d 840 (1968); Fincher v. Scott, 352 F.Supp. 117 (M.D.N.C.1972), aff'd, 411 U.S. 961, 93 S.Ct. 2151, 36 L.Ed.2d 681 (1973); and Thiess v. State Administrative Board of Election Laws, 387 F.Supp. 1038 (D.Md.1974). But these cases all concerned statutes which disqualified all felons or the equivalent.[2] They did not present the problem of selectivity presented by this case, and I find the dicta contained therein unpersuasive.[3]
 
 
 43
 The conclusion I would reach is supported by what the Fifth Circuit said in Shepherd v. Trevino, 575 F.2d 1110 (5 Cir. 1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979) and two district court decisions, Stephens v. Yeomans, 327 F.Supp. 1182 (D.N.J.1970), and Hobson v. Pow, 434 F.Supp. 362 (N.D.Ala.1977). Accord, Note, Disenfranchisement of Ex-Felons: The Standard of Review, 40 Missouri Law Review 130, 132-33, 134 (1975).
 
 
 44
 In Shepherd v. Trevino, plaintiffs, who had been convicted of separate felonies in federal court but who had satisfied the terms of probation and been discharged from supervision, argued that they had been unconstitutionally denied the right to vote under Texas's felon disenfranchisement statute. That statute granted the franchise to felons, but only after they had been "restored to full citizenship and right of suffrage, or pardoned." The plaintiffs argued that the state must have a compelling state interest for such a classification under the Equal Protection Clause, and that the statute did not satisfy a compelling state interest test.
 
 
 45
 The court rejected the plaintiffs' position based on Ramirez. The court said: "Section 2's express approval of the disenfranchisement of felons thus grants to the states a realm of discretion in the disenfranchisement and reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens." 575 F.2d at 1114. But the court concluded that criminal disenfranchisement statutes which choose among categories of criminals are subject to the Equal Protection Clause:
 
 
 46
 We do not read Richardson to hold that the realm of state discretion in disenfranchising persons convicted of felonies is limited to the disenfranchisement of all felons or none....
 
 
 47
 However, we are similarly unable to accept the proposition that section 2 (of the Fourteenth Amendment) removes all equal protection considerations from state-created classifications denying the right to vote to some felons while granting it to others. No one would contend that section 2 permits a state to disenfranchise all felons and then reenfranchise only those who are, say, white. Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote. Cf. Craig v. Boren, 429 U.S. 190 (97 S.Ct. 451, 50 L.Ed.2d 397) (1976) (twenty-first amendment does not empower states to discriminate invidiously on the basis of sex); Hobson v. Pow, 434 F.Supp. 362, 366-67 (N.D.Ala.1977) (disenfranchisement of one class of misdemeanants struck down as arbitrary). See Note, 40 Mo.L.Rev. 130 (1975). Therefore, we conclude that selective disenfranchisement or reenfranchisement of convicted felons must pass the standard level of scrutiny applied to state laws allegedly violating the equal protection clause. Such laws must bear a rational relationship to the achieving of a legitimate state interest. See, e. g., McGowan v. Maryland, 366 U.S. 420 (81 S.Ct. 1101, 6 L.Ed.2d 393) (1961).
 
 
 48
 Id. at 1114 (emphasis added). The court went on to find that the Texas statute did contain a rational classification.
 
 
 49
 Stephens v. Yeomans concerned a statute very similar to the statute in this case, a "crazy quilt" which inexplicably excluded some crimes while including others. The court traced the haphazard development of the statute and concluded that the resultant irrational list of disqualifying crimes could not survive equal protection analysis. Although decided before Ramirez, Stephens, in my view, survives Ramirez, because Stephens was based on the irrationality of the New Jersey statute, not on the state's supposed lack of power to disqualify felons from voting.
 
 
 50
 The other significant court decision, Hobson v. Pow, also supports my conclusion. In Hobson the court struck down the portion of an Alabama disqualification statute which disenfranchised wife-beaters. The court rested its decision on the fact that the statute violated the equal protection clause of the Fourteenth Amendment, because it treated one gender differently from another without even a rational reason for the differentiation. While recognizing the holding of Ramirez, the court found that this sex discrimination denied the plaintiff equal protection, see Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1974).II.
 
 
 51
 When the South Carolina statute is examined in light of the applicable equal protection principles, I think it is invalid.[4] I agree fully with the district court's apt analysis:
 
 
 52
 A simple glance at the crimes that are listed in § 7-5-120 (Proviso) (b) and those that are not, reveals what a kaleidoscopic quilt is portrayed. For one thing, the law discriminates among persons convicted of crimes of the same magnitude. Beating one's wife disfranchises; beating a stranger, or a son or daughter does not. Breaking into a house disenfranchises; breaking into a car does not. Robbing a person disfranchises; kidnapping him does not. The capriciousness which flows from the statute is patent. (footnote omitted)
 
 
 53
 I would reject South Carolina's argument that we should undertake to sever the statute so as not to invalidate the disqualifications which are supported by an acceptable rationale. I have no doubt that a state may disqualify some convicted persons without disqualifying all, so long as there is an acceptable rationale for the classification. Here, the defect in the statute is not merely the inclusion of one or more particular crimes, nor merely the exclusion of one or more particular crimes. The fault is in the overall collection of crimes the conviction of which is made disenfranchising. The statute, in my view, can be rendered constitutional only by rewriting it in its entirety, and I think that the task is better performed by the South Carolina General Assembly.[5]
 
 III.
 
 54
 If, notwithstanding my views, it is determined that § 2 of the Fourteenth Amendment permits the irrational collection of disqualifications contained in the South Carolina statute, I agree that the issue of racial discrimination must be addressed. Plaintiff has alleged that he is a Negro and he has charged that the statute denied him and members of his class rights guaranteed them by the Thirteenth, Fourteenth, and Fifteenth Amendments.
 
 
 55
 I, of course, express no view on the merits of this claim, but it seems clear to me that the contention is not manifestly frivolous. The statute has its genesis in the 1895 Constitution of South Carolina, and several students of South Carolina's history have concluded that racial discrimination was a factor in the selection of disenfranchising crimes:
 
 
 56
 A third requirement is that the voters shall never have been convicted of certain crimes involving moral baseness and common among negroes; but the black squint of this should not be over emphasized.
 
 
 57
 David D. Wallace, Constitution of 1895, 35 (1927).
 
 
 58
 It is not difficult to perceive how these elaborate regulations were designed to discriminate against the Negro. Among the disqualifying crimes were those to which he was especially prone: thievery, adultery, arson, wife-beating, housebreaking, and attempted rape. Such crimes as murder and fighting, to which the white man was as disposed as the Negro, were significantly omitted from the list.
 
 
 59
 Francis B. Simpkins, Pitchfork Ben Tillman, 297 (1944).
 
 
 60
 Additional measures against the Negro vote were provided by a list of disfranchising crimes, including those supposed by the whites to be most frequently committed by Negroes and those of the most heinous nature.
 
 
 61
 George B. Tindall, South Carolina Negroes 1877-1900, 82 (1966).
 
 
 62
 See also Ratliff v. Beal, 74 Miss. 247, 20 So. 865 (1896) (commenting on the disenfranchising provisions of the Mississippi Constitution on which the South Carolina Constitution was based). Even if subsequent amendments to the original statute were submitted to the Attorney General under the Voting Rights Act and expressly or impliedly approved by him, it does not follow, as defendants seem to argue, that such action insulates the statute from further inquiry as to a possible racially discriminatory purpose. See, 42 U.S.C. § 1973c; Morris v. Gressette, 432 U.S. 491, 506-07, 97 S.Ct. 2411, 2421, 53 L.Ed.2d 506 (1977); United States v. East Baton Rouge Parish School Board, 594 F.2d 56 (5 Cir. 1979).
 
 
 63
 I therefore concur in remand on the claim of racial discrimination to the district court.[6]
 
 
 64
 BUTZNER, J., authorizes me to state that he joins in this opinion.
 
 K. K. HALL, Circuit Judge, dissenting:
 
 65
 The majority has concluded that a state's authority to select disenfranchising offenses is unrestrained by the Equal Protection Clause. While such authority must necessarily be broad, I cannot agree that it is without limit.
 
 
 66
 Unlike the majority, I do not believe that the Supreme Court in Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974), anticipated the problem presented in this appeal. While Richardson preserved in general terms the state's power to exclude "some or all felons," it did not contain the in-depth analysis of the limits of that power demanded here. We are confronted with a statute which on its face classifies misdemeanors with felonies and arbitrarily discriminates among persons of equal culpability. The basic unfairness of this statute is obvious. Only a strained reading of Richardson can justify such legislation.
 
 
 67
 The principles of democracy and justice require that powers conferred upon governing bodies must have limits. I see no reason for making an exception such as the one created today. This decision not only permits abuses such as those embodied in the South Carolina statute, but also cripples the ability of the courts to prevent future abuses.
 
 
 68
 Judge Hemphill has clearly and forcefully expressed my views. I would affirm on the basis of his excellent opinion.
 
 
 69
 For these reasons and those expressed by WINTER, J., I must dissent.
 
 
 
 [1]
 S.C. Code § 7-5-120 (Proviso) (b)
 
 
 [2]
 The issue in the case was phrased by the court thus:
 These provisions are attacked as being a denial of equal protection in violation of U.S.Const. amend. XIV, § 1, and cruel and unusual punishment in violation of U.S.Const. amend. VII. Id. 118.
 
 
 [3]
 There is some disagreement among commentators on the effect of a summary affirmance of a lower court's decision by the Supreme Court but any question about the precedential effect of such affirmance in the Fincher and Beacham cases seems settled by the later treatment of such decisions "as substantial precedents" in Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). See, Linzer, The Meaning of Certiorari Denials, 79 Col.L.Rev. 1227, 1294 (1979)
 
 
 [4]
 This is the summarization of the holding as given by the author in The Supreme Court, 1973 Term, 88 Harv.L.Rev. 41 at 103 (1974)
 
 
 [5]
 An article sometimes cited as taking a contrary view of Richardson is Note, Constitutional Law-Equal Protection-Disenfranchisement of Ex-Felons: The Standard of Review, 40 Mo.L.Rev. 130 (1975). That Note, however, is ambiguous in its conclusions. It states that, "(t)he disenfranchisement of ex-felons may still (despite Richardson ) prove to have a constitutional limit." It bases this opinion on the fact that it finds that, "(t)he unpredictability of the Supreme Court is well known, and how it may rule on a particular classification is a matter of speculation." It then explains that disqualification for crimes "is a policy matter" and suggests that, "(t)here is no constitutional bar, state or federal, to (extending the franchise to ex-felons) by the Missouri's General Assembly." Id. at 136. No one would dissent from the conclusion that the State may include or omit whatever crimes it likes from the disqualification for crime or eliminate entirely such disqualification; this is a "value judgment" which Richardson declares is for the States. In any event we choose to follow the Supreme Court in Richardson until it rules otherwise, an event which we, unlike the author of the Note, regard as extremely unlikely
 
 
 [6]
 Note, The Need for Reform of Ex-Felon Disenfranchisement Laws, 83 Yale L.J. 580, 582-4 (1974)
 
 
 [7]
 Shepherd v. Trevino, 575 F.2d 1110 (5th Cir.), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1978), is quite different from this case. In it the attack was directed at a Texas disqualification statute which empowered Texas courts to reenfranchise felons convicted in those courts but granted no such right of reenfranchisement to felons convicted in a federal court who could only be reenfranchised in the State by obtaining a presidential pardon. The question thus posed in that case was whether a distinction in rights between a person convicted of a felony in federal court and one convicted of a like offense in state court violated equal protection. The case did not involve the right of a state, free of equal protection constraints, to disqualify for a crime. The right to disqualify for such crimes as the legislature found to justify such disqualification (the question in our case), was recognized. But, accepting the fact that the state was free to select the disqualifying crimes because § 2 said so, it did not follow, as the court observed, that, free from equal protection restraints, the state could make an arbitrary distinction between persons convicted of the disqualifying crimes because of race or sex, for instance. In other words, the state could declare that conviction of theft of wool but not of cotton was a felony and therefore a disqualifying crime but it could not go beyond that and declare, free from equal protection restraints, that if the convicted thief were white or a male he would not be disqualified. However, in that case, the court found that the distinction between state-convicted and federal-convicted felons had legitimate and valid basis in fact. Unlike the statute in Shepherd, though, the South Carolina statute applies indiscriminately to "any person," without regard to race or sex, who has been convicted of a crime designated as disqualifying in the statute, and raises no such issue as perplexed the court in Shepherd
 Hobson v. Pow, 434 F.Supp. 362, 363 (N.D.Ala.1977), is similar to Shepherd. It dealt with an Alabama disqualifying statute which like the South Carolina statute, disqualified for certain enumerated crimes, including wife-beating. The attack was strictly upon the validity of that one crime as a valid disqualification on the ground that it represented a sex classification since "conviction of men for assault and battery against the spouse is a cause for disqualification while the conviction of women for the same offense (was) not disqualifying." Id. at 367. The Court was particular to emphasize that the case did "not question 'whether a State may constitutionally exclude some or all convicted felons from the franchise.' Richardson v. Ramirez, supra. Instead, it questions whether the state may exclude people from the franchise by treating one sex differently from the other." Id. at 366-67. Hobson thus went off on the issue of sex discrimination, an issue not raised by the plaintiff in his complaint or in his presentation, either to the district court or to this court. In fact, wife-beating is, as Hite states, a felony in California and thus is not vulnerable to attack on equal protection grounds but, under Hobson, could have been made subject to attack for sex discrimination. The plaintiff did not raise a sex discrimination charge here because, convicted of forgery, he had no standing, either individually or as a class representative, to raise a sex discrimination claim based on the inclusion in the disqualifying crimes of wife-beating, and an excising of the crime of wife-beating, which was what the court did in Hobson, would not have benefitted him. Moreover, if the plaintiff had had standing to raise a sex discrimination claim against the disqualifying crime of wife-beating, his attack would not have been against the statute as a whole but only against the sex-related disqualification (i. e., wife-beating) and that crime could have been severed without disturbing the other crimes declared to be disqualifying in the statute. Incidentally, that was precisely what was done in Hobson.
 
 
 [8]
 The classic case on discrimination in the enforcement of a valid statute is Yick Wo v. Hopkins, 114 U.S. 356, 373-4, 6 S.Ct. 1064, 1072, 30 L.Ed. 220 (1886)
 
 
 [9]
 As the Court explained, this disparity in the application of the statute was "the result of differing interpretations of the 1966 Supreme Court of California decision in Otsuka v. Hite, 64 Cal.2d 596, 51 Cal.Rptr. 284, 414 P.2d 412, which defined 'infamous crime' as used in the California constitutional provisions."
 
 
 [1]
 An equal protection component in the First Amendment has also been discovered by legal astronomers. K. L. Karst, Equality as a Central Principle in the First Amendment, 43 Un. of Chi.L.Rev. 20 (1975)
 
 
 [2]
 For example, if disenfranchisement were statutorily mandated for all forgers over 45 but not for those under that age, or for left-handed, but not right-handed, forgers, a constitutional equal protection concept would somehow operate to void such arbitrary legislative distinctions
 The implicit equal protection elements in other portions of the Constitution are unlikely to expose themselves to view since in virtually every case either the first section of the Fourteenth Amendment, or the Fifth Amendment will apply to preserve and protect the equality concept. It requires an exceptional case, like the present one, where a state agency is not reached by the Fifth Amendment, and Fourteenth Amendment § 1 coverage has been eliminated for the reasons so cogently advanced in Judge Russell's majority opinion.
 
 
 [3]
 The fornicator is surely ephemeral, for there is no South Carolina crime of fornication
 
 
 [4]
 There may well be a convict whose wife-beating was so morally depraved, but that would require individual proof. The forger, on the other hand, was ipso facto depraved. I say nothing of what the result would be were a nondepraved wife-beater to bring suit. I only point out that the forger was, in fact, a dubious representative of the broadly designated class, since particularized proof would be required for many to see whether they do in fact have interests sufficiently like unto those of the named plaintiff to warrant his representation of them
 
 
 [1]
 Two sentences in the court's opinion succinctly express the holding:
 We hold that the understanding of those who adopted the Fourteenth Amendment, as reflected in the express language of § 2 and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons, is of controlling significance in distinguishing such laws from those other state limitations on the franchise which have been held invalid under the Equal Protection Clause by this Court.
 418 U.S. at 54, 94 S.Ct. at 2671.
 We therefore hold that the Supreme Court of California erred in concluding that California may no longer, consistent with the Equal Protection Clause of the Fourteenth Amendment, exclude from the franchise convicted felons who have completed their sentences and paroles.
 418 U.S. at 56, 94 S.Ct. at 2671.
 
 
 [2]
 The Maryland statute which was in issue in Thiess disqualified all persons convicted of "larceny or other infamous crime." The Attorney General of Maryland subsequently issued two opinion letters listing "infamous" crimes. That list does not indicate that the Attorney General had created an irrational collection of crimes, since the court noted that other crimes could be determined to be "infamous" even if they did not appear on the list. 387 F.Supp. 1040 n.3. In any event, the Maryland Attorney General indicated that all felonies were to be considered "infamous crimes" within the statute. 58 Op. Atty. Gen. 301 (1973)
 
 
 [3]
 In fact, the court in Green, in admittedly qualified language, appeared to recognize the possibility of an equal protection challenge: "There may, of course be crimes ... which are of such minor significance that exclusion for their commission might raise not only a question of wisdom ... but even a substantial constitutional question at least if we look at § 1 of the Fourteenth Amendment alone." 380 F.2d at 452
 
 
 [4]
 The district court was not required to decide whether the state must present a compelling justification for its selection of particular crimes, since the selection contained in the South Carolina statute did not survive scrutiny even under the less rigorous rational reason standard. Likewise, I find it unnecessary to determine whether criminal disenfranchising statutes must be subjected to a more rigorous test. However, I note that restrictions on the franchise have been carefully scrutinized in the past, see, e. g., Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In Ramirez, the Court found Kramer and similar cases inapplicable to the issue of state power to disenfranchise felons, because of the explicit provisions of § 2. 418 U.S. at 54, 94 S.Ct. at 2670. But Ramirez did not render Kramer inapplicable to a case like the instant one. When the form of a criminal disenfranchisement statute is at issue, as in this case, the cases found inapposite in Ramirez may determine the level of scrutiny to be applied to the restriction on the franchise
 
 
 [5]
 Cf. Carey v. Brown, --- U.S. ---, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); Police Department of Chicago v. Mosley, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)
 
 
 [6]
 On remand the district court should also address the question of whether the Act of June 25, 1868, 15 Stat. 73, under which South Carolina was readmitted to the Union placed any limitation on the power of South Carolina to disqualify criminals from voting. That statute provided, with respect to South Carolina and other states, as a condition of readmission to the Union:
 that the constitutions of neither of said states shall ever be so amended or changed as to deprive any citizens or class of citizens of the United States of the right to vote in said state, who are entitled to vote by the constitution thereof herein organized, or except as a punishment for such crimes as are now felonies at common law ....
 At the effective date of the Act of June 25, 1868, the South Carolina constitution disenfranchised only persons convicted of "treason, murder, robbery, or duelling". S.C.Constitution of 1868, Art. VIII, § 8. The present statute, in substantially its present form, did not appear until the S.C.Constitution of 1895.
 Thus there is a question as to whether the existing state statute offends the Act of June 25, 1868. Additionally, the Act of June 25, 1868, enacted by the same Congress that adopted the resolution of ratification of the Fourteenth Amendment, when coupled with the limited disqualification in the S.C.Constitution of 1868, suggests that it was not the intention of the framers of § 2 of the Fourteenth Amendment that citizens of the United States be disfranchised for all of the crimes enumerated in § 7-5-120 (Proviso), thus indicating the incorrectness of the view of the majority as to the validity of the present South Carolina disenfranchising statute for another reason.