[No. A028882. First Dist., Div. Two. Apr. 14, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ISAIAS VEGA-HERNANDEZ, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication except for parts I, II, III and IV.

## COUNSEL

John McDougall, under appointment by the Court of Appeal, for Defendant and Appellant.

Jeff Brown, Public Defender, Peter G. Keane, Chief Attorney, Grace Lidia Suarez, Deputy Public Defender, and Ephraim Margolin as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp, Attorney General, Thomas A. Brady and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—Appellant Isaias Vega-Hernandez appeals from convictions for causing injury to Judy and Ursula Schlicting while driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)); driving with a blood alcohol level of .10 percent or more, causing injury to the same victims (Veh. Code, § 23153, subd. (b)); and hit and run with injury. (Veh. Code, § 20001.) Appellant contends that insufficient evidence was adduced to identify him as the perpetrator of these offenses and that the trial court erred in instructing the jury that it could convict appellant of violations of both

subdivisions (a) and (b) of Vehicle Code section 23153; instructing on flight; failing to consider alcoholism as a mitigating factor in sentencing; using the conviction on count 2 to aggravate the sentence on count 1; finding aggravating factors to outweigh mitigating factors; and imposing an order of restitution in addition to appellant's prison term.

We reject all but the last of these contentions. We agree with appellant that the trial court's restitution order exceeded its authority and remand for further proceedings with instructions. In all other respects, we shall affirm the judgment.

STATEMENT OF FACTS

At approximately 1:10 a.m. on the morning of December 25, 1983, a brown Pontiac Firebird Trans Am was driven into the front bedroom of the home of Ursula Schlicting on Holly Street in Willits, California. The car landed on the bed where Ursula and her daughter, Judy, were sleeping, trapping the women beneath it. They were freed by the police and neighbors who came to the crash scene. Judy suffered cuts on her left eye and lower right leg and an eight-inch bruise on her left hip and rib. Ursula suffered three crushed vertebrae, which continue to cause her severe pain, and a floating chip in her right knee which occasionally causes pain; and sometimes feels pain in her stomach and liver areas.

Traffic officer Thomas Cook arrived at the scene at 1:13 a.m., two minutes after being summoned by a call. The car was fully inside the front bedroom; no one was inside it. The north and east walls of the house had been knocked out, and there was a large hole in the south wall. Outside, Cook found no tire or skid marks on the street or dirt shoulder or in the yard. A six-foot hole had been knocked in the fence. Cook opined that "the vehicle was going westbound on Holly Street. It left the roadway on the south side of the street. It went through the fence and hit a planter. [¶] At that point it became airborne and entered the north wall to the bedroom." Cook was approached by Jesus Ramirez, an acquaintance of appellant, who told Cook that appellant was the owner of the car and that Ramirez had seen the car enter Holly Street from Main Street shortly before the crash. Cook recalled Ramirez saying he had seen appellant driving, although Ramirez testified that he had seen only the car.

About 13 minutes after his arrival at the scene of the accident, Cook saw appellant and Juan Luna walking eastward on Holly Street. When Cook asked where they were headed, appellant said that they were out for a walk. Appellant was walking slowly and weaving; he had blood on his hand, pants leg, arm and face. Appellant said that he had hurt his hand falling down

because he was a little drunk. Appellant was wearing a black tee shirt and brown pants, and had no glass on his clothing. He was arrested and taken to Howard Hospital for treatment and a blood alcohol test, which showed a blood alcohol level of .20 grams per hundred milliliters. An expert criminalist testified that any person would be unable to operate a motor vehicle safely at a concentration of only .08 grams per hundred milliliters and that appellant was too drunk to drive safely.

As they arrived at the hospital, appellant inquired about the condition of his car. Cook had not previously discussed the accident with appellant. At a subsequent police station interview, appellant explained the question by saying that he had heard on the police radio that his car had been in a crash. At this interview, appellant stated that his car had been stolen that night. He had left the car running outside his home, which is a mile and a half south of the accident scene. He chased the car on foot towards town, but did not know what streets he followed. He did not remember the time of day, and had not reported the car stolen. He met Juan Luna a few minutes before being stopped by Cook. Appellant said he had been drinking tequilla all day and had driven his car that evening. He was released and rearrested some five months later; at this time he gave his name as Elieu Colon and admitted his identity only after being confronted with his fingerprint card.

Two neighbors of the Schlictings testified that they heard the crash, looked outside to investigate, and saw a man of appellant's description walking quickly away from the source of the noise. Both testified that they were quite certain appellant was this man.

After considering the probation report and testimony of Ursula and Judy Schlicting, the court sentenced appellant to the upper term of three years on count 1, did not sentence on count 2 and stayed sentence on count 3. Restitution was ordered to be paid to the victims in the amount of up to $4,000 for medical costs as determined; $859 for property losses; and $55,000 "general damages."

DISCUSSION

I.-IV.*

. . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 1084.

## V.

### *Restitution Order*

Appellant contends that the trial court's restitution order exceeded the court's authority and violated appellant's due process rights. This contention requires us to examine the constitutional and statutory authority for restitution orders in criminal cases.

The statutory basis for orders of restitution in effect at the present time is found in Penal Code section 1202.4 and Government Code sections 13959-13969. The Government Code sections establish procedures for defendants' payment of "penalty assessment[s]" into a statewide Restitution Fund (Gov. Code, § 13967) and crime victims' compensation from that fund for losses due to criminal activity. (Gov. Code, §§ 13961, 13964, 13965.) Under section 13967, subdivision (a), courts are required to impose a fine of not less than $100 nor more than $10,000 on defendants convicted of any crime. In determining the amount of the fine, the court is directed to consider "any relevant factors including, but not limited to, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, and the extent to which others suffered losses as a result of the crime," including "pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime." (Gov. Code, § 13967, subd. (a).) Penal Code section 1202.4, subdivision (a), requires defendants convicted of felonies to pay restitution fines as provided in Government Code section 13967, subdivision (a), unless "compelling and extraordinary reasons" exist for waiving the fine.

The foregoing statutory framework was established in the Crime Victim Restitution Program of 1983. (Pen. Code, § 1202.4, Gov. Code, §§ 13959-13969.1.) ■ It is not, however, applicable to the present case because the offense occurred shortly before the operative date of the act. (*People* v. *Palomar* (1985) 171 Cal.App.3d 131, 134 [214 Cal.Rptr. 785].)[10] Under previous legislation in effect on the date of the instant offense, fines could be assessed only against defendants convicted of "a crime of violence" and

---

[10]The act containing Penal Code section 1202.4 was made effective immediately upon enactment on September 27, 1983, but expressly provided that it would become operative on January 1, 1984. (*People* v. *Palomar, supra,* 171 Cal.App.3d at pp. 133-134.) These seemingly conflicting provisions have been interpreted to mean that the "'enactment is a law on its effective date only in the sense that it cannot be changed except by legislative process; the rights of individuals under its provisions are not substantially affected until the provision operates as law.'" (*Id.,* at p. 134, quoting *People* v. *Henderson* (1980) 107 Cal.App.3d 475, 488 [166 Cal.Rptr. 20].) The offense in this case occurred on December 24, 1983, eight days prior to the operative date of the statute.

having the ability to pay. (Gov. Code, § 13967, amended 1983.) As under present legislation, such fines could not exceed $10,000. (*Ibid.*) Victims could receive a cash payment or other forms of assistance by application to an "Indemnity Fund" (Gov. Code, § 13961, as amended in 1983, § 13964, as amended in 1982; see former Gov. Code, § 13967).[11]

At the time of the instant offense, the term "restitution" appeared in the criminal code only as a possible condition of probation rather than, as now, an additional penalty. (Pen. Code, § 1203.1.) In the probation context, however, the statute refers to restitution "to be made to the victim" rather than paid to a fund. ■ The term restitution generally refers to such direct payment, as distinguished from indirect compensation programs through which victims receive compensation from the state. (Note, *Where Offenders Pay for Their Crimes: Victim Restitution and Its Constitutionality* (1984) 59 Notre Dame L.Rev. 685, 688-689 and n. 35; Harland, *Monetary Remedies for the Victims of Crime: Assessing the Role of the Criminal Courts* (1982) 30 UCLA L.Rev. 52, 60-64.)

■ ■ ■ ■ ■ As indicated, in addition to imposing a three-year prison term, the trial court ordered appellant to pay restitution to Ursula and Judy Schlicting in the amount of up to $4,859 for medical costs and property losses, and $55,000 general damages for pain and suffering and lost earning capacity. This order lacked statutory basis under either the presently effective or then-applicable framework described above, neither of which provides for direct restitution, orders greater than $10,000, or compensation for property losses or pain and suffering. (*People* v. *Downing* (1985) 174 Cal.App.3d 667, 672 [220 Cal.Rptr. 225]; Note, *Restitution for Crime Victims: The California Legislature Responds to Proposition 8* (1984) 14 Sw.U. L.Rev. 745, 766.)[12]

■ The Attorney General, with the support of amicus curiae Criminal Justice Legal Foundation, argues that the trial court's order was nevertheless valid under the authority of article I, section 28, subdivision (b), of the California Constitution (hereinafter section 28(b)), adopted by vote of the people in June 1982 as part of Proposition 8, which establishes a right to

---

[11]Prior to 1982, victims could be compensated only for losses which they could not "recoup without suffering serious financial hardship." (Gov. Code, § 13964, amended 1982.)

[12]Former Government Code section 13967, the application of which to this case is discussed, *post*, at pp. 1099-1100, authorizes fines "commensurate with the offense committed, and with the probable economic impact upon the victim," and victims could receive assistance for "pecuniary loss," including medical and psychological expenses, lost income and support. (Gov. Code, §§ 13964, 13960.) As amended, section 13967 includes compensation for "intangible losses, such as psychological harm"; but neither it nor other legislation expressly authorizes damages for pain and suffering. (Note, *Restitution for Crime Victims: The California Legislature Responds to Proposition 8, supra*, 14 Sw.U. L. Rev. 745, 767.)

restitution for crime victims. Appellant and amicus curiae California Attorneys for Criminal Justice counter that the trial court's restitution order was not authorized by section 28(b) because that provision is not self-executing.

Section 28(b) provides as follows: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer. [¶] Restitution shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary. The Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section."

■ It has often been stated that constitutional provisions "will be presumed to be self-executing and to be given effect without legislation, unless a contrary intention is clearly expressed. (*Taylor* v. *Madigan* (1975) 53 Cal.App.3d 943 . . .; 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 38, pp. 3277-3278; 16 Am.Jur.2d, Constitutional Law, §§ 93, 94, p. 280; 13 Cal.Jur.3d, Constitutional Law, §§ 31-33, pp. 71-75.) And it has been judicially determined that '. . . "A constitutional provision may be said to be self-executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced. . . ." [Citation.] [¶] . . . (*Chesney* v. *Byram* (1940) 15 Cal.2d 460, 463 [101 P.2d 1106].)'" (*Flood* v. *Riggs* (1978) 80 Cal.App.3d 138, 154 [145 Cal.Rptr. 573].)

As a general rule, a directive to the Legislature to implement a constitutional provision is an expression of intent that the provision not be self-executing, as the language of the provision is addressed to the Legislature rather than to the courts. (16 Am.Jur.2d, Constitutional Law, § 144, p. 517.) The provision "must be regarded as self-executing if the nature and extent of the right conferred and the liability imposed are fixed by the Constitution itself, so that they can be determined by an examination and construction of its terms and there is no language indicating that the subject is referred to the Legislature for action [citation]; and such provisions are inoperative in cases where the object to be accomplished is made to depend in whole or in part on subsequent legislation." (*Taylor* v. *Madigan* (1975) 53 Cal.App.3d 943, 951 [126 Cal.Rptr. 376].)

■ It is clear that section 28(b) contains language directing the Legislature to act: its last sentence states, "The Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section."

Respondent, relying most heavily on *Flood* v. *Riggs, supra,* 80 Cal.App.3d 138, argues that a constitutional provision may be self-executing despite such language if, as is assertedly here the case, it states " " " "a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced. . . ." " " " (*Id.,* at p. 154.) We think respondent misconstrues the meaning of *Flood.*

*Flood* v. *Riggs* concerns article II, section 4, of the California Constitution: "The Legislature shall prohibit improper practices that affect elections and shall provide for the disqualification of electors while mentally incompetent or imprisoned or on parole for the conviction of a felony." Holding the provision to be self-executing, and referring to *Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 204-205 [107 Cal.Rptr. 137, 507 P.2d 1345], reversed on other grounds, 418 U.S. 24 [41 L.Ed.2d 551, 94 S.Ct. 2655], and cert. den. 418 U.S. 904 [41 L.Ed.2d 1152, 94 S.Ct. 3194], the court stated that the directive to the Legislature "must be interpreted to mean simply that the Legislature's authority to implement is well recognized." (*Flood* v. *Riggs, supra,* 80 Cal.App.3d at p. 154.) The citation to *Ramirez* v. *Brown* demonstrates that this statement is an interpretation of the intent reflected by the directive language in the context of the unusual history of article I, section 4, rather than a general interpretation of such directive language. *Ramirez* construed the 1972 amendment of a prior form of the provision at issue in *Flood,* then numbered article II, section 3. Prior to 1972, the provision had stated that no persons belonging to certain enumerated classes "shall ever exercise the privileges of an elector in this state."[13] The 1972 amendment stated that "the Legislature shall provide" for the same result.[14] According to *Ramirez, supra,* 9 Cal.3d at page 204, the 1972 amendment worked "no difference in substance." The court noted that implementation of the voting disqualifications originally set forth in the Constitution was a frequent purpose of legislative action and that a number of existing statutes pertained to this issue. Because it refused to view the amendment as an implied repeal of such provisions, the court held that "the addition of the words, 'The Legislature shall provide' must be interpreted merely as an express recognition of the legislative authority which has in fact been exercised since the earliest days of our state government." (*Ibid.*)

---

[13]The provision (prior to amendment numbered art. II, § 1) stated: "no alien ineligible to citizenship, no idiot, no insane person, no person convicted of any infamous crime, no person hereafter convicted of the embezzlement or misappropriation of public money, and no person who shall not be able to read the Constitution in the English language and write his or her name, shall ever exercise the privileges of an elector in this State." (*Ramirez, supra,* 9 Cal.3d at p. 204.)

[14]"The Legislature shall prohibit improper practices affecting elections and shall provide that no severely mentally deficient person, insane person, person convicted of an infamous crime, nor person convicted of embezzlement or misappropriation of public money shall exercise the privileges of an elector in this state." (Former art. II, § 3.) (*Ramirez, supra,* 9 Cal.3d at p. 204.)

We view *Flood* v. *Riggs* as adopting an interpretation of constitutional language rooted in the determination that the amendment of the constitutional provision in question was not motivated by a desire to alter existing statutes. (*Ramirez* v. *Brown, supra,* 9 Cal.3d at p. 204.) Precisely the opposite is true in the present case: section 28(b) appears to establish for crime victims an unqualified right to direct restitution from convicted persons, at a time when the existing statutory framework provided for restitution from a fund, based on victims' need,[15] with dollar limitations and dependent on defendants' ability to pay. In this context, it is difficult to view the last sentence of section 28(b) as anything other than a directive to the Legislature to promptly implement the right established by the provision.

In addition to *Flood* v. *Riggs,* respondent relies upon two eminent domain cases both decided in 1881, *Weber* v. *County of Santa Clara* (1881) 59 Cal. 265 and *Trahern* v. *San Joaquin County* (1881) 59 Cal. 320. *Weber* and *Trahern* presented the question whether an 1874 statute authorizing the taking of land for public use without court proceedings violated then article XIV, section i, of the state Constitution. Article XIV, section i, provided as follows: "Private property shall not be taken or damaged for public use without just compensation having been made to, or paid into Court for the owner, and no right of way shall be appropriated to the use of any corporation other than municipal, until full compensation therefor be first made in money or ascertained and paid into Court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived as in other civil cases in a court of record, as *shall be prescribed by law.*" (Italics added.) Notwithstanding the italicized language, which appears to direct the enactment of implementing legislation, the Supreme Court tersely concluded that "[t]he constitutional provision is prohibitory in its nature and is self-executing." (*Weber* v. *County of Santa Clara, supra,* 59 Cal. 266; accord *Trahern* v. *San Joaquin County, supra,* 59 Cal. at p. 321.) The reasoning of this holding was later provided by the Supreme Court in *Rose* v. *State of California* (1942) 19 Cal.2d 713 [123 P.2d 505]. Reaffirming the holdings in *Weber* and *Trahern,* the court in *Rose* explained that the constitutional provision in issue (which at the time of *Rose* was contained in art. I, § 14, of our Constitution and is at the present time, in modified form, set forth in art. I, § 19) did not create a new right, but imposed a limitation upon the exercise of a pre-existing right of eminent domain inherent in state sovereignty. "Under our system of government all powers not granted by the Constitution of the United States to the federal government are reserved

---

[15]Government Code section 13964, governing application for assistance from the state fund, was amended to delete reference to victims' financial need in September 1982; Proposition 8 was passed in June 1982.

to the states, and the power of eminent domain is one of those reserved powers. It does not as a consequence, depend for its existence upon a specific grant in the constitution of a state. Instead, it is inherent in the sovereign state and founded upon the law of necessity. This power however, may be limited by constitutional provision, and it has been held that a constitutional provision for the payment of compensation is a limitation aimed by the Constitution at the power of eminent domain, limiting the exercise of that power by the public in favor of the individual owner of property. [Citations.]" (*Rose* v. *State of California, supra,* 19 Cal.2d at p. 719.) The court concluded that because the constitutional provision in issue was "a restriction placed by the Constitution upon the State itself, and upon all of its agencies who derive from it their power of eminent domain, it cannot be said that the mere failure of the legislature to enact a statute allowing suit to be brought against the state entitles the state to disregard and violate that limitation. The logical inference is that said constitutional provision is intended to be self-enforcing." (*Id.,* at p. 720.)

Unlike the state constitutional provision regarding eminent domain, section 28(b) is neither "prohibitory" nor "self-enforcing," as it does not impose a restriction on the exercise of any state power; rather it confers upon certain private persons—those "who suffer losses as a result of criminal activity"—a new right against the person or persons who inflicted such losses. Therefore, the reasoning of the eminent domain cases does not provide a basis for concluding that the constitutional provision with which we are here concerned is self-executing.

A constitutional provision which for present purposes is analogous to the one before us, and which has been judicially analyzed to determine whether it is self-executing, is that providing for various mechanics liens. Article XIV, section 3, of our Constitution states that: "Mechanics, persons furnishing materials, artisans, and laborers of every class, shall have a lien upon the property upon which they have bestowed labor or furnished material for the value of such labor done and material furnished; and the Legislature shall provide, by law, for the speedy and efficient enforcement of such liens." Interpreting an earlier but virtually identical version of this provision,[16] our Supreme Court concluded that "[t]his declaration of a right, like many others in our constitution, is inoperative except as supplemented by legislative action. [¶] So far as substantial benefits are concerned, the naked right without the interposition of the legislature is like the earth before the creation, 'without form and void,' or to put it in the usual form,

---

[16]Prior to the constitutional amendment on November 5, 1974, this provision was contained in article XX, section 15. The only substantive change effectuated by the amendment was to substitute "persons furnishing materials" for "material men."

the constitution in this respect is not self-executing." (*Spinney* v. *Griffith* (1893) 98 Cal. 149, 151-152 [32 P. 974]; accord, *Borchers Bros.* v. *Buckeye Incubator Co.* (1963) 59 Cal.2d 234, 238 [28 Cal.Rptr. 697, 379 P.2d 1]; *Reese* v. *Bald Mountain etc. Min. Co.* (1901) 133 Cal. 285, 290 [65 P. 578].)

██ ██ ██ ██ ██ We do not think the constitutional provision for restitution is more complete—and therefore less in need of implementing legislation—than that providing for mechanics liens.[17]

The nature of the "loss" a crime victim must suffer in order to be entitled to restitution is not specified in the constitutional provision. ██ ██ ██ ██ ██ Thus the Legislature may not only prescribe minimum standards of proof as to the fact and extent of loss, but has discretion to determine, for examples, whether restitution for speculative and contingent losses may be ordered; whether nonpecuniary items of personal injury, such as pain and suffering, are reparable losses; and whether a victim may receive full

---

[17]This case is unusual in that the constitutional provision claimed to be self-executing has been implemented by the Legislature. This legislative action is thus available to us as proof that the constitutional provision is amenable to legislative refinement and not self-executing. The difficulty with this approach, however, is the Attorney General's claims that the statutory scheme is in critical particulars inconsistent with the constitutional provision and therefore does not succeed and should not be considered as implementation of the constitutional provision. As the Attorney General points out, pursuant to Penal Code section 1202.4 and Government Code section 13967, restitution is to be ordered only from defendants convicted of felonies (whereas section 28(b) provides that it "shall be ordered from the convicted persons in every case, regardless of the sentence or disposition imposed"); restitution orders are limited to a maximum of $10,000 (whereas section 28(b) contains no limitation on the amount that may be ordered); and restitution fines are to be deposited in a Restitution Fund (whereas section 28(b) provides that victims "shall have the right to restitution from the persons convicted.") Due to these discrepancies, it is urged that we declare the statutes unconstitutional and void. (See *Hampton* v. *Christensen* (1906) 148 Cal. 729, 737 [84 P. 200]; *People* v. *Western Airlines, Inc.* (1954) 42 Cal.2d 621, 637 [268 P.2d 723], app. dism. 348 U.S. 859 [99 L.Ed. 677, 75 S.Ct. 87], and *Flood* v. *Riggs, supra,* 80 Cal.App.3d 138, 154.)

The statutory rule is well established that a court will not decide a constitutional issue unless absolutely obliged to do so in order to dispose of the case before it. (*People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].) As we have seen, Penal Code section 1202.4 and amended Government Code section 13967 do not apply to the instant proceeding and the constitutionality of those statutes is therefore irrelevant to the disposition of this case. Although this issue may be one of broad public interest, there will be ample opportunity for courts to address it in appropriate cases in the future. (Cf. *In re William M.* (1970) 3 Cal.3d 16, 25 [89 Cal.Rptr. 33, 473 P.2d 737].)

In order to avoid the necessity of ruling upon the constitutionality of the statutes intended by the Legislature to implement section 28(b), we do not rely upon those statutes as evidence that the constitutional provision leaves room for legislative elaboration. Instead, we confine our analysis to the terms of the constitutional provision itself and inquire whether the language therein is amenable to legislative clarification.

restitution for a property loss or personal injury which may in part have been brought about by lack of reasonable care on his or her own part.[18]

Similarly, section 28(b) does not identify the "compelling and extraordinary reasons" which may justify the denial of restitution. The Legislature may therefore determine, for example, that the indigency of the convicted person, the fact that he or she will be required to serve a lengthy prison term, or other factors may excuse the duty to make restitution to the victim.[19]

Finally, section 28(b) is entirely silent as to the procedures that must be invoked before a court is authorized to order restitution. The obligation

---

[18]The majority of states appear to limit restitution orders to economic loss, but some authorize damages like those available in civil actions. (Harland, *Monetary Remedies for Victims of Crime: Assessing the Role of the Criminal Courts* (1982) 30 UCLA L.Rev. 52, 88-89.) It must be understood, however, that the restitution mandated by section 28(b) is not synonymous with compensation, which does not necessarily require direct payment from offenders to victims. (Note, *Where Offenders Pay for their Crimes, supra,* 59 Notre Dame L.Rev. 685, 688.) As a condition of probation, restitution in California has primarily been viewed as serving a rehabilitative function rather than as primarily achieving the purpose of victim compensation. (Note, *Proposition 8, supra,* 14 Sw.U. L.Rev. at p. 745.) The purposes of restitution have been described as "rehabilitating the offender and deterring future criminal conduct." (*People v. Goss* (1980) 109 Cal.App.3d 443, 460 [167 Cal.Rptr. 224].) The crucial distinction between restitution and compensation is reflected in the observation of the California Supreme Court that "[r]estitution imposed in a proper case and in an appropriate manner may serve the salutary purpose of making a criminal understand that he has harmed not merely society in the abstract but also individual human beings, and that he has a responsibility to make them whole." (*People v. Richards* (1976) 17 Cal.3d 614, 620 [131 Cal.Rptr. 537, 552 P.2d 97].) When victims are compensated from a fund, their losses are repaid regardless whether the responsible offender has been convicted or fined; if an offender is fined, the fine is paid not to the victim but to the state. This kind of compensation cannot impress upon the offender the connection between the offense and its victims stressed in *Richards, supra.* "[Restitution's] rehabilitative effectiveness stems from its direct relation to the amount of damage suffered by the victim: by ordering restitution, a court forces the defendant to acknowledge in concrete terms the harm he has caused. . . . [R]estitution promotes rehabilitation more effectively than does a fine, because it requires the offender to pay the individual harmed rather than the abstract, impersonal state, and thereby impresses upon the offender his responsibility to others. Through restitution, an offender can express guilt in a socially acceptable manner and can increase his self-respect by gaining a sense of accomplishment." (Note, *Victim Restitution in the Criminal Process: A Procedural Analysis* (1984) 97 Harv. L.Rev. 931, 938, citations omitted.) "The act of making restitution—especially when made in kind or by personal service—provides the offender an opportunity for a cathartic recognition of wrongdoing and for symbolic expiation of guilt." (Note, *Restitution in the Criminal Process: Procedures for Fixing the Offender's Liability* (1984) 93 Yale L.J. 505, 508 fn. 12.)

[19]We are aware that in enacting the 1983 legislation which at least ostensibly implements section 28(b) the Legislature chose not to define the precise circumstances which will excuse the duty to make restitution, but simply reiterated in Penal Code section 1202.4, subdivision (a), that ". . . if the court finds that there are compelling and extraordinary reasons, the court may waive imposition of the [restitution] fine." However, by thus leaving it to the courts to define the reasons that may be deemed "compelling and extraordinary" the Legislature has not relinquished the right to define the constitutional language at some future time.

fulfilled through a restitution order is owed to the victim rather than to the state, and is in some respects similar to civil damages awards. Permitting a criminal court to order what may seem to be compensation for losses recoverable in civil trials presents important procedural as well as substantive due process problems. (*People* v. *Richards, supra,* 17 Cal.3d 614, 620.) It is true that courts ordering restitution as a condition of probation have been allowed leeway to use "any rational method" to fix an amount reasonably calculated to make the victim whole (*In re Brian S.* (1982) 130 Cal.App.3d 523, 531 [181 Cal.Rptr. 778]); however, the cases caution that "the criminal process should not be ' ". . . used to supplement a civil suit or as a threat to coerce the payment of a civil liability and thus reduce the criminal court to a collection agency." ' " (*In re Brian S., supra,* 130 Cal.App.3d 523, 529, citing *People* v. *Williams* (1966) 247 Cal.App.2d 394, 405 [55 Cal.Rptr. 550], quoting from *State* v. *Scherr* (1960) 9 Wis.2d 418 [101 N.W.2d 77].) The silence of section 28(b) as to resolution of the "difficult practical problems of hearing and determination" which it presents (Witkin, Cal. Criminal Procedure (1985 supp. pt. I) § 23 NN, p. 74) renders it entirely appropriate for the Legislature to assume this responsibility as an aspect of its duty to implement the constitutional provision.

In short, the right of a crime victim to restitution and the manner in which that right shall be enforced are not set forth in the Constitution so completely that the direction to the Legislature to "adopt provisions to implement . . . section [28(b)]" can be deemed meaningless surplusage.

Finally, we are aware of no extrinsic evidence of the intent of the voters who enacted Proposition 8 compelling the conclusion that the restitution provision was thought to be self-executing. Indeed, what scant evidence of the voters' intent exists indicates just the opposite. The only statement pertinent to this issue that appeared in the voter's pamphlet for the election on June 8, 1982, was that of the Legislative Analyst, observing that "The Legislature would be responsible for adopting laws to implement this section of the measure." (Ballot Pamp., Primary Elect. (June 8, 1982) p. 32.) This statement, which is a proper extrinsic aid in discerning voter intent (*In re Lance W.* (1985) 37 Cal.3d 873, 888 [210 Cal.Rptr. 631, 694 P.2d 744]), although not dispositive, surely suggests that the right to restitution cannot be effectuated without legislation to "implement" that right.[20]

---

[20]Indeed, it is difficult to conclude that the voters believed section 28(b) to be self-executing when the most visible law enforcement officials in California clearly thought otherwise. On June 9, 1982, the day after the election at which Proposition 8 was adopted, the Attorney General, now the Governor, advised all district attorneys, sheriffs and chief probation officers in the state that section 28(b) was *not* self-executing and that "operation of the provision must await enactment of appropriate legislation." (Office of Atty. Gen., Atty. Gen.'s Guide to Proposition 8 (June 9, 1982) p. 2-2.) On the same day, the District Attorney

Aside from *Flood* v. *Riggs, supra,* 80 Cal.App.3d 138, which to the extent pertinent must be limited to its unique facts, and the eminent domain cases, which are inapposite, we are aware of no California case holding that a constitutional provision like the one before us is self-executing. The general rule we distill from the case law is this: a nonprohibitory constitutional provision which does not merely permit but directs the Legislature to implement a newly conferred right is not self-executing unless, as is extremely unlikely, the legislative directive is purposeless because the provision is so complete with respect to the nature of the right and the means of its enforcement as to deprive the Legislature of any discretion in either respect.

Because section 28(b) directs the Legislature to adopt implementing legislation, and because that constitutional provision does not so completely define the nature of the right it newly confers nor the means of enforcing that right as to render the directive to the Legislature insignificant, section 28(b) is not a self-executing constitutional provision.

It thus appears that neither statutory nor constitutional authority supported the trial court's order of direct restitution. The only form of restitution the trial court could have imposed was a penalty assessment under Government Code section 13967.[21] Because it is clear the trial court believed restitution was warranted, we will remand for consideration of such an order. In so doing, we note the limitations on the trial court's discretion imposed by the statutory scheme applicable to sentencing in this case: the definition of compensable losses (former Gov. Code, § 13960, subd. (e)), the upper limit of $10,000 and the required consideration of appellant's ability to pay. (Former Gov. Code, § 13967.)

---

of Los Angeles County, now the Attorney General, expressed the same view. In a "special directive" to all deputy district attorneys in his office he declared, inter alia, that section 28(b) "is not self-executing. The Legislature must pass implementing legislation before our office can take any further action." (Reprinted in Criminal Practice After Proposition 8 (Cont.Ed.Bar July 1982) pp. 321-343, at p. 323.) We note that the present Attorney General's change of mind on this issue appears to have just occurred, for in the recently decided case of *People* v. *Downing, supra,* 174 Cal.App.3d 667, in which the court struck a restitution order as being statutorily unauthorized, the Attorney General apparently did not contend that section 28(b) was self-executing.

That section 28(b) is not self-executing is also the conclusion of the commentators who, in the wake of voter adoption of Proposition 8, addressed the issue. Witkin, for example, agrees that although the constitutional right to restitution is declared in section 28(b) in unmistakable terms, "implementation of the provision is left to the Legislature." (Witkin, Cal. Criminal Procedure (1985 supp. pt. I) § 23 NN, p. 74; accord Criminal Practice After Proposition 8 (Cont.Ed.Bar July 1982) p. 94 [the right of restitution, "though clearly established by the initiative, is equally clearly not self-executing."].)

[21]Although most offenses involving motor vehicles are excluded from the reach of this section as it read before the 1983 amendment, the offenses of which appellant was convicted (Veh. Code, §§ 20001 and 23153) were then, and remain, specifically included in the definition of "crime" in Government Code section 13960, subdivision (c).

Our last comments are prompted by appellant's contention that the order of direct restitution in this case violated his due process rights. Because we have held that the only possible order on remand would be a restitution fine in the form of a penalty assessment under former Government Code section 13967, the only one of appellant's points which need concern us is the factual basis for the amount of restitution ordered.[22] Whatever the specific procedural safeguards required at a sentencing hearing concerning restitution, fundamental fairness must be assured and reliability of the information upon which an order is based is the "key issue in determining fundamental fairness." (*People* v. *Arbuckle* (1978) 22 Cal.3d 749, 755 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171].) We note grave concerns in this regard as to the basis of the trial court's calculation of the amount of damages heretofore ordered. The court was provided descriptions of the injuries sustained by the two victims in the form of their testimony at the sentencing hearing, the summary of their description in the probation report and the doctor's report from the initial hospital visit. No medical evidence, however, established the permanence of the injuries or future earning capacity of the victims. The only information before the court on this issue was Ursula Schlicting's statement that she would be unable to ever hold a job because of her back pain. A much more reliable factual basis must be developed and appellant provided a reasonable opportunity to be heard.

The restitution order is stricken and the cause remanded for further proceedings consistent with the views set forth herein to determine whether a restitution order is warranted under former Government Code section 13967. In all other respects, the judgment is affirmed.

Rouse, J., and Smith, J., concurred.

---

[22]Appellant's other arguments are that the order for "general damages" amounts to a civil judgment rendered without benefit of jury trial and that the failure to consider appellant's ability to pay is a violation of due process. The former version of Government Code section 13967, which applies to this case, requires consideration of ability to pay. Thus the restitution that may properly be ordered upon remand will not constitute "general damages" within the meaning of the civil law.